## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LEHIGH VALLEY PROPERTIES,** | : | |
| **and LAURIE ATIYEH** | : | |
| **PLAINTIFFS,** | : | **NO.** |
| | : | |
| **VS.** | : | |
| | : | |
| **CITY OF ALLENTOWN,** | : | |
| **And Mayor Edward Powlaski** | : | |
| **Acting in his capacity as Mayor,** | : | |
| **Pennsylvania Department of** | : | |
| **Transportation** | : | |
| **DEFENDANTS.** | : | |

## COMPLAINT

**AND NOW COME**, Plaintiffs, Laurie Atiyeh and Lehigh Valley Properties, by and through Everett Cook, Esquire, and states and avers as follows:

1.     Plaintiff, Lehigh Valley Properties (hereinafter referred to as LVP), is a business located at 901-933 N Ivy Street, Allentown, Lehigh County, Commonwealth of Pennsylvania 18012.

2.     Lehigh Valley Properties is owned and operated by a woman, Laurie Atiyeh.

3.     Plaintiff Laurie Atiyeh is an adult individual, who owns and operates LVP, with a business address located at 901-933 N Ivy Street, Allentown, Lehigh County, Commonwealth of Pennsylvania.

4.     Defendant, the City of Allentown (hereinafter referred to as the City) is a governmental entity, with a business address located at 435 Hamilton Street, Allentown, Lehigh County, Pennsylvania.

5. At all times Lehigh Valley Properties intended to continue business as a going concern at its location at 901-933 N Ivy Street, Allentown, Lehigh County, Commonwealth of Pennsylvania 18012.

6. On or about August 3, 2011 the City initiated a condemnation action against LVP's land located at 901-933 N Ivy Street, Allentown, Lehigh County, Commonwealth of Pennsylvania 18012 for the American Parkway extension project.

7 At all times the City and Richard Young who was the Chief Engineer for the city of Allentown and in charge of the American Parkway Extension, knew Laurie Atiyeh, a woman, owned and operated LVP.

8. At all times Edward Powlaski, Mayor of Allentown, while acting in his capacity as mayor, initiated the condemnation matter against Laurie Atiyeh and LVP.

9. At all times the Pennsylvania Department of Transportation was involved in the American Parkway Extension.

10. Laurie Atiyeh and LVP were at all times opposed to the condemnation of their land.

11. Laurie Atiyeh and LVP opposed its condemnation by filing actions in State Court as well as in Federal Court by filing two (2) bankruptcies.

12. At all times in her communication with the City, Laurie Atiyeh was acting as president of LVP.

13. Starting in February of 2011, Laurie Atiyeh and LVP began contacting the City, specifically City engineer Richard Young by email about the American Parkway Extension on March 24, 2011, May 4, 2011 and May 12th 2011, but received no response from the City. True

and correct copies of the March 24, 2011, May 4, 2011 and May 12th 2011 emails are attached hereto and made a part hereof as Exhibit "A".

14. At all times Laurie Atiyeh and LVP were trying to contact the City in order to reach a reasonable solution to the condemnation action. Laurie Atiyeh writes, in part, "If the City gives ample time and cooperation, Lehigh Valley Properties is confident a fair agreement can be met in a timely manner. Thank you. Sincerely, Laurie Atiyeh" (See Exhibit "A", May 12, 2011 email)

15. Laurie Atiyeh and LVP made several phone calls to Richard Young, City Engineer, and left messages asking him to call her back to arrange a meeting or work out a fair agreement.

16. The City never responded to Laurie Atiyeh's email.

17. The City never responded to Laurie Atiyeh's or LVP phone calls.

18. At the same time Laurie Atiyeh and LVP was trying to establish communications with the City, the City sat down with a church which owned property across the street from LVP's land. The City negotiated a settlement with the church for $290,000.00 for ¼ acre of vacant land.

19. The City never did, and still has not, met with Laurie Atiyeh and LVP to discuss potential settlement for LVP's land which is in excess of 1 ½ acres.

20. After almost a year of receiving no response from the City with regard to her requests for a meeting to discuss settlement, Laurie Atiyeh and LVP chose to retain Attorney Nicholas R. Sabatine III to represent her and her corporation in dealing with the City.

21. Attorney Sabatine was hired on October 26, 2011, to become the contact person for LVP.

22.    Attorney Sabatine also contacted the City demanding a meeting between the parties.

23.    As noted in Attorney Sabatine's letter of August 8, 2012, Plaintiffs, Laurie Atiyeh and LVP, believe that they are entitled to moving expenses in the amount of $330,000.00, $12,000.00 to re-establish the business and $60,000.00 in lost net earnings during relocation, $4,000.00 in appraisal fees and $500.00 for searching for a new location and that the value of the land is at least $840,000. Copies of the August 8, 2012 letter and appraisal are attached as Exhibits B-1 and B-2, respectively.

24.    The total demand, as evidenced by Attorney Sabatine's letter is $1,116,500.00. As such, Plaintiffs, Laurie Atiyeh and LVP, believe that there is equity in the property.

25.    At no time have Plaintiffs, Laurie Atiyeh and LVP, received even the estimated equity suggested by the City in their just payment notice.

26.    Therefore Plaintiffs, Laurie Atiyeh and LVP, even if they had in fact lost title, still have equity in the property even by the City's estimates.

27.    Plaintiffs, Laurie Atiyeh and LVP have a contract with HRI, Inc. The second part of which began in January of 2013. A true and correct copy of the HRI, Inc. contract which is attached hereto and made a part hereof as Exhibit "C".

28.    The HRI contract calls for Plaintiffs, Laurie Atiyeh and LVP to take possession of, either by way of pick up or drop off, substantially all of the debris from the demolition and reconstruction of the Route 145 and Route 22 bypass.

29.    Plaintiffs, Laurie Atiyeh and LVP anticipate between $15,000 and $25,000 per month for this contract which should run at least one year. LVP received its first check from HRI in

April of 2013 for \$24,000. This contract represented a substantial increase in business for this Corporation and without this contract; it is possible the Corporation would have folded.

30.     It is certain that without the ability to maintain this contract Plaintiffs, Laurie Atiyeh and LVP will not be able to pay their debts and be able to relocate to another location.

31.     Should the City take actual possession of the land in question – land that runs right down the middle of LVP's operation – Plaintiffs will not be able to continue operation. True and correct copies of photos of Plaintiffs' operation are attached hereto and made a part hereof as Exhibit "D".

32.     The Plaintiffs, Laurie Atiyeh and LVP overriding focus is to maintain the business as a going concern.

33.     In April of 2013 there was a hearing scheduled in Lehigh County Courthouse concerning the taking of Laurie Atiyeh's and LVP's land.

34.     In the weeks and days leading up to the April 5th hearing, Plaintiffs, Laurie Atiyeh and LVP through counsel, advised the City that they would not be able to continue to do business should the City gain actual possession.

35.     The April 5th hearing could have lead to actual possession being granted as soon as that same day.

36.     Plaintiffs, Laurie Atiyeh and LVP requested assurances from the City that actual possession would not be sought or that a financial package to allow relocation of Plaintiffs' operations would be discussed with the City. Plaintiffs received zero assurances. Plaintiff's and Defendants had no discussions.

37.     The demand letter assumed that the business could relocate and continue on as a going concern.

38.     The City never sat down with Laurie Atiyeh or LVP after hiring of Attorney Sabatine.

39.     The City had its own appraisal of the property performed which showed a value of the property to be $104,000.

40.     Laurie Atiyeh and LVP believe the disparity in the values is because of Laurie Atiyeh's gender.

41.     Laurie Atiyeh and LVP believe the reason the Defendants did not meet with Laurie Atiyeh and LVP, when it had met with their neighbors, was because of Laurie Atiyeh's gender.

42.     After the condemnation action began, Laurie Atiyeh continued to run LVP at its Ivy Street property. The City required insurance from LVP to indemnify the City in order to continue doing business on the land still possessed by LVP but taken by the City of Allentown in regards to the American Parkway Extension. After proof of the insurance was provided to the City of Allentown, the city required Laurie Atiyeh to personally indemnify the City in order to continue doing business on the land still possessed by LVP.

43.     After the condemnation action was filed the City, in early 2012, initiated a tax sale against LVP, a minority owned company. The City had $104,000. in escrow at this time but listed the property for tax sale for $7,000. on a property that was owned free and clear.

44.     While the City could have paid for the taxes with the funds held in escrow, it did not. LVP and Laurie Atiyeh paid the $7,000. from their own funds to avoid the tax sale.

45.     LVP and Laurie Atiyeh are not aware of any other business or property owner who was required to provide personal indemnification to the City for the American Parkway Project.

46.     Laurie Atiyeh and LVP believe the indemnification was required because of Laurie Atiyeh's gender.

47.     In May of 2014, Laurie Atiyeh and LVP tried to purchase mulch/compost from the City. The City would not sell mulch/compost to Laurie Atiyeh and LVP.

48.     Laurie Atiyeh and LVP believe and therefore aver that the City's refusal to sell mulch/compost is because of Laurie Atiyeh's gender.

49.     Without the funds to relocate, Laurie Atiyeh and LVP have had to turn down new contracts including but not limited to the Aldredge Electric Contract referenced in the letter attached to this Complaint as Exhibit "E".

50.     The discriminatory acts of the City have cost Laurie Atiyeh and LVP future contracts and earnings. Laurie Atiyeh and LVP have essentially been forced out of business.

51.     The city also initiated a tax sale against LVP and Laurie Atiyeh

## COUNT I – GENDER DISCRIMINATION
## UNDER THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT

52.     Plaintiffs Laurie Atiyeh and LVP incorporate herein by reference their responses to Paragraphs 1 through 51 above as though more fully set forth herein at length.

53.     To establish a prima facie case of gender discrimination under the Equal Protection clause, Plaintiff must prove the existence of purposeful discrimination.   Andrews v. City of Philadelphia, 895 F.2d 1469 (3d Cir. 1990).   Specifically, Plaintiff must prove that she received different treatment from that received by other individuals similarly situated and that the disparate treatment was based on her gender. Id. (quoting Kuhar v. Greensburg-Salem School Dist. 616 F.2d 6767, 677 n.1 (3d Cir. 1980)).

54.     The Court has rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not "natural persons." *Id.,* at 776, 98 S. Ct. 1407, 55 L. Ed. 2d 707; see *id.*, at 780, n. 16, 98 S. Ct. 1407, 55 L. Ed. 2d 707. Cf. *id.*, at 828, 98 S. Ct. 1407, 55 L. Ed. 2d 707

(Rehnquist, J., dissenting). The court has held that, in regards to Constitutional Rights, corporations should be put on the same legal footing as people. Id.

55. Plaintiff Laurie Atiyeh and LVP received different treatment in that:

    a. The City did sit down with a church which owned property across the street from LVP's land and the City negotiated a settlement with that church for $290,000.00 for ¼ acre of vacant land; whereas the City has ignored repeated written and verbal requests for a meeting with Laurie Atiyeh and LVP.

    b. The City required insurance from LVP and required Laurie Atiyeh to personally indemnify the City in order to continue doing business; whereas Plaintiffs are unaware of any other business that was required to do same.

    c. Taxpayers and businesses of the City of Allentown are allowed to purchase mulch/compost from the City at a nominal rate if loaded by the City, or for free if self-loading; whereas the City refused to sell mulch/compost to Laurie Atiyeh and LVP.

    d. The City, while holding $104,000. in escrow for this property, forced a tax sale which required LVP and Laurie Atiyeh to pay $7,000. out of their own funds to avoid the tax sale.

56. Plaintiff believes that the only reason for the clearly different treatment received by her and LVP is that she is a female and the City felt they could treat her differently based on her gender.

WHEREFORE, Plaintiffs respectfully request this honorable court find in favor of Plaintiff and against Defendant in the amount in excess of $1,116,500 and such other relief as this Honorable Court deems appropriate.

Date: 7/3/14

Respectfully submitted,

By:
Everett Cook, Esquire
Attorney for Plaintiffs
I.D. No. 202039

**LAW OFFICES OF EVERETT COOK, P.C.**
2747 MacArthur Road
Whitehall, PA 18052

Phone: 610-351-3566
Fax:    610-351-3556

## VERIFICATION

I, Laurie Atiyeh, verify that the statements made in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are subject to the penalties of 28 U.S.C. 1746 - Unsworn declarations under penalty of perjury

Date: _____

Laurie Atiyeh

# EXHIBIT "A"

**From:** Laurie Atiyeh <risingson8102@aol,com>
   **To:** youngr <youngr@allentowncity.org>; sapany <sapany@plec.us>
**Subject:** American Parkway Extension
   **Date:** Thu, Mar 24, 2011 4:27 pm

Mr. Richard Young,
I hope all is well.  The GeoTech Studies have been completed with 100% cooperation and help from Adams Earth Products on Ivy Street.  We used some of our equipment and man power on occasion as we did with the Environmental Studies.  AEP requested the results be sent to 5828 Park Valley Road  in Schnecksville, PA 18078.  The engineers all agreed, however, we have not received them, but would appreciate a copy if possible. We have not heard from the city in regards to the material which the city needs help moving.  Adams Earth Products is happy to help the city in any way we can.  We assure you we are authorized by the the Conservation District and DEP to accept and truck the soil material.
Please let us know if we can be of assistance.

Sincerely,
Laurie Atiyeh
Adams Earth Products

**From:** Laurie Atiyeh <risingson8102@aol.com>

**To:** youngr <youngr@allentowncity.org>; risingson8102 <risingson8102@aol.com>

**Subject:** Fwd: American Parkway Extension

**Date:** Wed, May 4, 2011 2:01 pm

Dear Mr. Young,

I hope you had a wonderful Easter and are enjoying the warmer weather.

I tried contacting you March 24th (via the email message attached below) in regard to the Ivy Street property. As was requested, please forward all Environmental, Geological and Final Plans to me. You may either mail them to Adam's Earth Products at 5828 Park Valley Road Schnecksville, PA 18078 or email them to me at this email address. Once the above information (which was promised from the engineering companies) along with the Final Plan is received, I will set up a meeting with Pany Lentz Engineering to discuss the Ivy Street Property. As stated earlier, only if the churches, neighborhood, and fire department have approved the plan, will the plan be considered.

This is the busy season for our farm and recycling business. Please supply us with the above information as soon as possible so we can respond accordingly. I realize you, along with your colleagues, are also very busy. We have tried contacting Ann in connection with recycling on occasions to no avail.

Please provide the appropriate parties with our contact information. I will look forward to hearing from you. Thank you and have a great day.

Sincerely,

Laurie Atiyeh

-----Original Message-----

From: Laurie Atiyeh <risingson8102@aol.com>

To: youngr <youngr@allentowncity.org>; sapany <sapany@plec.us>

Sent: Thu, Mar 24, 2011 4:27 pm

Subject: American Parkway Extension

Mr. Richard Young,

I hope all is well. The GeoTech Studies have been completed with 100% cooperation and help from Adams Earth Products on Ivy Street. We used some of our equipment and man power on occasion as we did with the Environmental Studies. AEP requested the results be sent to 5828 Park Valley Road in Schnecksville, PA 18078. The engineers all agreed, however, we have not received them, but would appreciate a copy if possible. We have not heard from the city in regards to the material which the city needs help moving. Adams Earth Products is happy to help the city in any way we can. We assure you we are authorized by the the Conservation District and DEP to accept and truck the soil material.

Please let us know if we can be of assistance.

Sincerely,

Laurie Atiyeh

Adams Earth Products

From: Laurie Atiyeh <risingson8102@aol.com>

To: geositsm <geositsm@allentowncity.org>; youngr <youngr@allentowncity.org>; fruhwirthf
   <fruhwirthf@allentowncity.org>; hheeter <hheeter@state.pa.us>; risingson8102 <risingson8102@aol.com>

Subject: Re: Lehigh Valley Properties email response,

Date: Thu, May 12, 2011 1:22 pm

May 12, 2011

Dear Mr.Young and Mr. Geosits

Thank you very much for your response and cooperation. The engineering reports and final plan are critical.
Lehigh Valley Properties will set up a meeting with Pany & Lentz and request their assessment of the project. It is
great news the fire department, churches and neighbors are in support of the project. Earlier reports from the
original plan were negative from all. In fairness, Lehigh Valley Properties will have the land appraisal done. If you
know an independent appraiser we would appreciate if you could possibly forward the information to us to speed
the process. On the issue of liens, Lehigh Valley Properties is not aware of a $47,000 lien (or liens). If you could
kindly forward the Title Search via email, Fax (610)264-3304 or mail directly to 5828 Park Valley Road
Schnecksville, PA 18078, the company will review and rectify the matter as soon as possible. To have a meeting
with Steve Pany, have a property appraisal and rectify the lien issue will take some time. As with the churches,
fire department and community we wish to reach a satisfactory agreement for all involved. Lehigh Valley
Properties and Adam's Earth Products have been fully cooperative and supportive of this worthwhile project; I
pray the City shows the same cooperation and consideration. We look forward to helping the City of Allentown
make this a successful project as we have with past and current PennDot projects. If the City gives ample time
and cooperation, Lehigh Valley Properties is confident a fair agreement can be met in a timely manner.
Thank You.

Sincerely,

Laurie Atiyeh

-----Original Message-----
From: Geosits, Mark <geositsm@allentowncity.org>
To: Young, Richard <youngr@allentowncity.org>; Fruhwirth, Frances <fruhwirthf@allentowncity.org>;
risingson8102 <risingson8102@aol.com>
Sent: Tue, May 10, 2011 4:00 pm
Subject: Lehigh Valley Properties email response

Dear Ms. Atiyeh:

Please review the attached letters and respond to the City of Allentown concerning its contents by Friday 13,
2011.

# EXHIBIT "B-1"

## Nicholas R. Sabatine, III, P.C.
### 16 S. Broadway, Suite 1
### Wind Gap, PA 18091

Phone: (610) 863-9044     Email: sabatinelaw@rcn.com     Fax: (610) 863-9046

August 8, 2012

Dale R. Wiles, Esquire
Assistant City Solicitor
City of Allentown
519 City Hall
435 Hamilton Street
Allentown, PA 18101

Re:  Condemnation of Lands of Lehigh Valley Properties by the
City of Allentown

Dear Attorney Wiles:

As I previously indicated, I am writing to submit a modified demand based upon my client's appraisal and the additional damages incurred as a result of the taking.

The demand is $1,116,500.00. This demand was determined as follows.

The just compensation for the taking of the land is $710,000.00 per the appraisal. Pursuant to Section 902(a) of the Code, my client will incur moving expenses on the remainder of the inventory on the remaining parcels which constitute collectively his business site in the amount of $330,000.00. This calculation was made based upon an estimate of 30,000 cubic yards of material to be removed. My client utilized a cost of $150 per truck load requiring approximately 2,000 truck loads plus 24 days of an excavator and operator at a cost of $1,250.00 per day. We believe these costs are well within the current costs for such services in the Lehigh Valley.

In addition to the above, we have added $12,000.00 in costs to re-establish the business at an alternate location, $4,000.00 for appraisal expenses and $60,000 for loss of net earnings during the relocation. Finally, we have added $500 for the cost of searching for a replacement location. My client has already expended most of this sum with respect to time and I anticipate there will be additional time, however, for the purposes of these negotiations the $500 figure is what is requested.

I have previously forwarded to you case law and correspondence from my client's engineer to substantiate the basis for the appraisers calculation and opinion. Should you have any questions, I am available to address them. I believe this demand is both reasonable and is substantiated by adequate proof should a Board of View be necessary. In the first instance, however, I would request a response prior to filing for a Board of View.

Dale R. Wiles, Esquire
August 8, 2012
Page Two

As I indicated in my email earlier this week, Lehigh Valley Properties is in the process of withdrawing its bankruptcy petition. It is doing this as a gesture of good faith with respect to the completion of this matter, however, my client has advised me that it reserves the right to seek further relief from the Bankruptcy Court should that be warranted.

I look forward to hearing from you regarding this demand at your earliest convenience.

Very truly yours,

NICHOLAS R. SABATINE, III

NRS/klr

Enclosure

# EXHIBIT "B-2"



**ENGINEERING COMPANY**

**RE:  Impact of American Parkway on**
**Lehigh Valley Properties**
**Ivy Street Site Recycling Operation**

February 22, 2012

Atty. Nicholas Sabatine
16 S. Broadway
Wind Gap, PA

Dear Atty. Sabatine:

As requested I have appraised myself of the Lehigh Valley Properties Ivy Street
Recycling Operation, evaluated the American Parkway Roadway Construction Plans and
assessed the impact to the operation from the right-of-way and slope easement for
American Parkway.

The Recycling Business is currently conducted on three parcels containing about 4.4
acres. The site includes tax parcels G9NE3b, Block 3, Lots 5, 5A and 5B. Most of the
site is utilized for recycling operations. An access way for single unit and tractor trailer
trucks splits the site and recycled concrete and soil stock piles are situated on each side of
the access way.

The site is relatively irregular and subject to a 28 feet grade differential half of which
occurs in the middle of the site. The 1.4 acres of right-of-way and slope easement for
American Parkway will divide the site limiting the remnant Lehigh Valley Properties
yard area south of the American Parkway to about one acre. The remnant area to the
north is about two acres half of which is useful for recycling due to constraints from an
access way, irregular shape parcel and steep sloping topography.

Due to the nature of the recycling business a minimum of three contiguous and modestly
sloping acres are required for operations. To operate a recycling business several acres
for storing a critical mass of inventory integral with at least an acre for loading/staging/
processing are required. Neither remnant parcel separately nor in combination can
accommodate a recycling use similar to the current operation.

My assessment of the impact of the American Parkway to Lehigh Valley Properties
Recycling Operation is based on general operational constraints and does not include
addressing zoning dimensional criteria, setback and buffer which will need to be satisfied
and further limit the portion of the parcel that can be utilized for recycling.

With engineering certainty, the remnant parcels are inadequate to conduct a recycling
operation, the nature and minimum size of which is necessary to accommodate a viable
business.

Pany & Lentz Engineering Company
609 Hamilton Street • Allentown, PA 18101
PHONE: 610/433-1634 • FAX: 610/433-1636

If you have questions or wish to discuss matters in further detail do not hesitate to contact me.

Very truly yours,

**Pany & Lentz Engineering Company**

Stephen A. Pany, PE

Pany & Lentz Engineering Company
609 Hamilton Street • Allentown, PA 18101
PHONE: 610/433-1634 • FAX: 610/433-1636



## REAL ESTATE APPRAISAL
## PROPERTY OWNED BY
## LEHIGH VALLEY PROPERTIES

| PROPERTY ADDRESS | LOT | TAX PARCEL NUMBER |
|---|---|---|
| 901 IVY STREET | 5B | 640736994963 |
| 919 IVY STREET | 5A | 640736869299 |
| 929-933 IVY STREET | 5 | 640736880126 |

## CITY OF ALLENTOWN,
## LEHIGH COUNTY, PENNSYLVANIA

### EFFECTIVE VALUATION DATE

### AUGUST 22, 2011

### PREPARED FOR

NICHOLAS R. SABATINE, III, ESQ.
16 S. BROADWAY, SUITE 1
WIND GAP, PENNSYLVANIA 18091

### PREPARED BY

BINSWANGER
TWO LOGAN SQUARE
PHILADELPHIA, PENNSYLVANIA  19103



**BINSWANGER**
TWO LOGAN SQUARE, PHILADELPHIA, PA 19103-2759
215-448-6000 • FAX: 215-448-6238 • E-MAIL: INFO@BINSWANGER.COM

August 3, 2012

Nicholas R. Sabatine, III, Esq.
16 S. Broadway, Suite 1
Wind Gap, Pennsylvania 18091

> Re:   Real Estate Appraisal of Property
> Owned by Lehigh Valley Proper-
> ties, Consisting of Three Contigu-
> ous Tax Parcels Located in the City
> of Allentown, Lehigh County,
> Pennsylvania

Dear Mr. Sabatine:

In accordance with your request, I have inspected and prepared a Summary Appraisal
Report on the real estate for the following properties:

| Property Address | Lot | Tax Parcel Number |
|---|---|---|
| 901 Ivy Street | 5B | 640736994963 |
| 919 Ivy Street | 5A | 640736869299 |
| 929-933 Ivy Street | 5 | 640736880126 |

**PURPOSE OF THE APPRAISAL:** To estimate the fair market value of the subject
property, but assuming no liens or other indebtedness against the property. The value
estimate is expressed in terms of cash. The property rights reflect the value of the
land and the existing improvements comprising the subject property, described
further in this Report. The fair market value determination is that of the subject
property prior to the condemnation taking and the value of the property that remains
after the taking.

REGIONAL • NATIONAL • INTERNATIONAL REAL ESTATE
REGIONAL OPERATIONS:   Atlanta, GA • Charlotte, NC • Chicago, IL • Cincinnati, OH • Dallas, TX • Denver, CO • Detroit, MI • Houston, TX
King of Prussia, PA • Las Vegas, Nevada • Los Angeles, CA • Mahwah, NY • Miami, FL • Minneapolis, MN • Natick, MA • New York, NY • Newport Beach, CA
Owings Mills, MD • Oxford, MS • Philadelphia, PA • Seattle, WA • Tampa, FL • Toledo, OH • Washington, D.C. • Woodland Hills, CA • Bangkok
Buenos Aires • Caracas • Hanoi • Hamburg • Lima • London • Madrid • Mexico City • Milan • Montreal • Mumbai • Paris • Quito • Sao Paulo • Santiago
Seoul • Shanghai • Singapore • Sydney • Tel Aviv • Taipei • Tokyo • Toronto • Warsaw • Zurich

160 Offices Worldwide
North America • South America
Europe • Middle East
Asia • Australia
www.binswanger.com



Nicholas R. Sabatino, III, Esq.
August 3, 2012
Page Two

The enclosed Summary Appraisal Report describes the subject property and the method of estimating market value. This Appraisal conforms to the Uniform Standards of Professional Appraisal Practice (USPAP) and Title XI (and amendments) of the Financial Institution Reform, Recovery and Enforcement Act of 1989 (FIRREA). This Appraisal Report is intended to comply with the reporting requirements set forth under Standards Rule 2-2(b) of the USPAP for a Summary Appraisal Report.

**INTENDED USE OF REPORT:** The function of this valuation is for condemnation purposes and in accordance with the PA Eminent Domain Code. Nicholas R. Sabatino, III, Esquire is the client and can provide a copy of this Appraisal Report to the property ownership, Lehigh Valley Properties, the Pennsylvania Department of Transportation or the appropriate jurisdictions for condemnation proceedings.

**INTEREST VALUED:** Fee simple interest

**DATE OF VALUATION:** The effective date of valuation is that of the condemnation date indicated as August 22, 2011. The property was inspected on June 27, 2012. Therefore, the effective valuation date is a retrospective date. There has been no significant change in title ownership, zoning or physical characteristics of the site between the effective valuation date and the date of inspection.

**APPRAISAL DEVELOPMENT AND REPORTING PROCESS:** In preparing this Summary Appraisal Report, the appraiser performed a physical inspection of the subject property. Research of public records was made to verify the ownership, zoning, real estate assessment and taxes. In developing an opinion of market value, comparable market data was verified and analyzed within this process. This Summary Appraisal Report primarily sets forth the pertinent market data used in the appraisal process and the appraiser's conclusions.

**REAL ESTATE APPRAISED:** 901-933 Ivy Street, City of Allentown, Lehigh County, Pennsylvania consists of three contiguous parcels containing 4.433 acres of industrial zoned land before the taking. Subsequent to the taking, a proposed road right-of-way will result in a bisected property comprising two noncontiguous parcels with 3.451 acres. The impact on the property, as indicated by Damages, is the loss of land area, slope easements, and loss of use at this location for a material storage and recycling operation.

**BINSWANGER**

Nicholas R. Sabatine, III, Esq.
August 3, 2012
Page Three

**MARKET VALUE CONCLUSIONS:**  After a thorough analysis of all of the
enclosed information, the fee simple market values of the subject property, as of
August 22, 2011, are as follows:

| | |
|---|---|
| MARKET VALUE BEFORE THE TAKING: | $840,000 |
| MARKET VALUE AFTER THE TAKING: | $130,000 |
| DAMAGES | $710,000 |

Thank you for the opportunity to be of service and please contact us if there are any
questions pertaining to this Report.

Sincerely,

Christopher J. Hall

Christopher J. Hall
Appraisal Division
Certified General Real Estate Appraiser
Commonwealth of Pennsylvania
License No. GA-000213-L
Expiration: June 30, 2013

CJH:pb
Enclosure



# TABLE OF CONTENTS

SUMMARY OF IMPORTANT CONCLUSIONS ..............................................................1

ASSUMPTIONS, LIMITING CONDITIONS AND SCOPE .........................................4

CERTIFICATION OF APPRAISAL ................................................................................7

APPRAISAL DEFINITIONS............................................................................................8

LOCALITY.......................................................................................................................9
    REGIONAL LOCATION MAP.......................................................................9
    REGIONAL DESCRIPTION...........................................................................9
    NEIGHBORHOOD LOCATION MAP.........................................................12
    NEIGHBORHOOD DESCRIPTION .............................................................12
    AMERICAN PARKWAY PROJECT.............................................................13

THE SUBJECT PROPERTY .........................................................................................14
    OWNERSHIP AND OCCUPANCY.............................................................14
    LAND BEFORE THE TAKING....................................................................14
    TAX MAP......................................................................................................14
    LAND AFTER THE TAKING.......................................................................15
    SITE PLAN....................................................................................................15
    FLOOD ZONE MAP.....................................................................................17
    ZONING MAP...............................................................................................18
    ASSESSMENT AND TAXES .......................................................................19
    SUBJECT PHOTOGRAPHS.........................................................................20

HIGHEST AND BEST USE ..........................................................................................25
    BEFORE THE TAKING...............................................................................25
    AFTER THE TAKING..................................................................................25

THE APPRAISAL PROCESS.........................................................................................27
    SALES COMPARISON APPROACH...........................................................28
    VALUE BEFORE TAKING .........................................................................28
    VALUE AFTER TAKING............................................................................38

RECONCILIATION........................................................................................................46
    DAMAGES....................................................................................................46

EXHIBITS ......................................................................................................................48
    QUALIFICATIONS

**BINSWANGER**

## SUMMARY OF IMPORTANT CONCLUSIONS



*Aerial view of subject, shown for illustration purposes only*

**PROPERTY LOCATION:**

Three   Contiguous   Tax   Parcels, Located in City of Allentown, Lehigh County, Pennsylvania consisting of:

| Property Address | Lot | Tax Parcel Number |
|---|---|---|
| 901 Ivy Street | 5B | 640736994963 |
| 919 Ivy Street | 5A | 640736869299 |
| 929-933 Ivy Street | 5 | 640736880126 |

**OWNERSHIP:**

Lehigh Valley Properties

**OCCUPANT:**

Owner

**LAND AREA BEFORE TAKING:**

4.433 acres

**LAND AREA AFTER TAKING:**

3.451 acres

**IMPROVEMENTS:**

No building improvements

**ZONING:**

I-3, General Industrial District

- 1 -



### SUMMARY OF IMPORTANT CONCLUSIONS – (Continued)

<u>ASSESSMENT</u>:                            $32,550 (2012 assessed value)

<u>HIGHEST AND BEST USE</u>
   <u>BEFORE TAKING</u>:                    Continued industrial use
   <u>AFTER TAKING</u>:                     Land-banking as an interim land use

<u>INSPECTION DATE</u>:                     June 27, 2012

<u>VALUATION DATE</u>:                      August 22, 2011

<u>BEFORE TAKING VALUE CONCLUSION</u>: $840,000

<u>AFTER TAKING VALUE CONCLUSION</u>:  $130,000

<u>DAMAGES</u>:                             $710,000

<u>COMMENTS</u>: The valuation process considers the specific use of the property for which it was intended and replacement of the site equivalent in functional utility as that which has been taken through condemnation.

The fair market value after the taking indicates a value for the property as a result of a proposed road right-of-way that will bisect through the mid-point of the property. This will render the site virtually unusable for that use in which it was occupied prior to the condemnation.

Damages consider the quality and condition of the real estate prior to the taking and in this case more specifically it pertains to the replacement value or cost for a similar type site. The value after the taking, while only reducing the land area by approximately 1.315 acres, substantially reduces the viability of the use of the site as the land area to be taken traverses the central part of the site creating two noncontiguous parcels. The difference between these two valuation scenarios results in damages to the real property value interest.

The attributes of the subject site *prior to the taking* are considered and compared with the limitations that result subsequent to the taking. The attributes include:

- The I-3, General Industrial zoning is the most liberal of the Allentown City's industrial zoning categories.

- The subject location immediately north of the existing American Parkway corridor.

- Location of less than one mile south of U.S. Route 22 with only one traffic signal between the subject property and the east bound highway entrance.

- 2 -



**SUMMARY OF IMPORTANT CONCLUSIONS** – (Continued)

- The topography provides for storage of material without additional construction barriers or infrastructure improvements to contain the storage material from leaving the site.

*Subsequent to the taking,* the following limitations, restrictions or reduction in quality of the real estate are considered:

- Reduction in the land area by 0.982 acre.

- Steep slope easement area (0.365 acre) further reduces land use potential.

- Bisecting of the property and the taking of the central site elevation.

- Division of the property into two significantly smaller parcels which results in the inability to continue the same recycling and storage operation.

- There are few sites available that would serve as adequate replacements with a comparable level of zoning and that would also permit a similar type operation.

- To acquire a replacement site with similar logistical capabilities, a zoning variance may be necessary for a number of available or comparable sites within proximity to the major highways.

 **BINSWANGER**

## ASSUMPTIONS, LIMITING CONDITIONS AND SCOPE

### THIS APPRAISAL REPORT HAS BEEN MADE WITH THE FOLLOWING GENERAL ASSUMPTIONS:

1.  No responsibility is assumed for the legal description or for matters including legal or title considerations. Title to the property is assumed to be good and marketable unless otherwise stated.

2.  The property is appraised free and clear of any or all liens or encumbrances unless otherwise stated.

3.  Responsible ownership and competent property management are assumed.

4.  The information furnished by others is believed to be reliable. However, no warranty is given for its accuracy.

5.  All engineering is assumed to be correct. The plot plans and illustration material in this Report are included only to assist the reader in visualizing the property.

6.  It is assumed that there are no hidden or unapparent conditions of the property, subsoil or structures that render it more or less valuable. No responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them.

7.  It is assumed that the property is in full compliance with all applicable federal, state and local environmental regulations and laws unless noncompliance is stated, defined and considered in the Appraisal Report.

8.  Unless otherwise stated in this Appraisal Report, the existence of hazardous material, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation or other potentially hazardous materials may affect the value of the property. The value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired.

9.  The Americans with Disabilities Act (ADA) became effective January 26, 1992. The appraiser has not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property together with a detailed analysis of the requirements of the ADA could reveal

- 4 -



### ASSUMPTIONS, LIMITING CONDITIONS AND SCOPE - (Continued)

that the property is not in compliance with one or more of the requirements of the act. If so, this fact could have a negative effect upon the value of the property. Since the appraiser has no direct evidence relating to this issue, possible noncompliance with the requirements of ADA in estimating the value of the property was not considered.

10. It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless a nonconformity has been stated, defined and considered in the Appraisal Report.

11. It is assumed that all required licenses, certificates of occupancy, consents or other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this Appraisal Report is based.

12. It is assumed that the utilization of the land and improvements is within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the Appraisal Report.

13. The indicated property value includes only those items classified as real estate. No items of machinery & equipment or personal property are included.

### THIS APPRAISAL REPORT HAS BEEN MADE WITH THE FOLLOWING GENERAL LIMITING CONDITIONS:

1. The distribution, if any, of the total valuation in this Appraisal Report between land and improvements applies only under the stated program of utilization. The separate allocations for land and buildings must not be used in conjunction with any other appraisal and are invalid if so used.

2. Possession of this Appraisal Report, or a copy thereof, does not carry with it the right of publication. It may not be used for any purpose by any person other than the party to whom it is addressed without the written consent of the appraiser and in any event only with proper written qualification and only in its entirety.

3. The appraiser herein by reason of this Appraisal Report is not required to give further consultation, testimony or be in attendance in court with reference to the property in question unless arrangements have been previously made.

4. Disclosure of the contents of this Appraisal Report is governed by the By-Laws and Regulations of the Appraisal Institute.



## ASSUMPTIONS, LIMITING CONDITIONS AND SCOPE - (Continued)

5.  Neither all nor any part of the contents of this Appraisal Report (especially any conclusions as to value, the identity of the appraiser or the firm with which he is connected, or any reference to the Appraisal Institute) shall be disseminated to the public through advertising media, public relations media, news media, sales media, or any other public means of communication without the prior written consent and approval of the undersigned.

## THIS APPRAISAL REPORT HAS BEEN MADE WITHIN THE FOLLOWING SCOPE:

1.  Definition of market value and valuation question.

2.  Determination of necessary data to be collected and considered.

3.  The land areas are based upon condemnation documentation provided by the ownership which originated from The PA Department of Transportation. This Appraisal Report assumes the land areas are accurate and in accordance with the information provided.

4.  Determination of the Highest and Best Use of the subject property.

5.  Development and application of appropriate valuation methods.

6.  Correlation of value estimates and final conclusion.



## CERTIFICATION OF APPRAISAL

**I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF:**

1. The statements of fact contained in this Report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial and unbiased professional analyses, opinions, and conclusions.

3. I have no present or prospective interest in the property that is the subject of this Report and I have no personal interest with respect to the parties involved.

4. I have performed no professional services regarding the property that is the subject of this Report within the three-year period immediately preceding acceptance of this assignment.

5. I have no bias with respect to the property that is the subject of this Report or to the parties involved with this assignment.

6. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this Appraisal.

8. The reported analyses, opinions, and conclusions were developed, and this Report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute, which include the *Uniform Standards of Professional Appraisal Practice.*

9. The use of this Report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

10. I have made a personal Inspection of the property that is the subject of this Report.

11. No one provided significant real property appraisal assistance to the person signing this certification.

12. I am in compliance with the Competency Provision in USPAP as adopted in FIRREA in 1989 and I have sufficient education and experience to perform a real property appraisal of the subject property.

August 3, 2012

Christopher J. Hall

Christopher J. Hall
Certified General Real Estate Appraiser
Commonwealth of Pennsylvania
License No. GA-000213-L
Expiration: June 30, 2013

- 7 -



## APPRAISAL DEFINITIONS

As a general rule in determining the fair market value of the remaining property after a partial taking, consideration shall be given to the use to which the property condemned is to be put and the damages or benefits specially affecting the remaining property due to its proximity to the improvement for which the property was taken. For purposes of this report, fair market value and market value are the same. Pertinent definitions are as follows:

### Fair Market Value

Per Section 703 of Title 26 of the Eminent Domain Code, fair market value shall be the price which would be agreed to by a willing and informed seller and buyer, taking into consideration but not limited to the following factors:

*(1) The present use of the property and its value for that use.*

*(2) The highest and best reasonably available use of the property and its value for that use.*

*(3) The machinery, equipment and fixtures forming part of the real estate taken.*

*(4) Other factors as to which evidence may be offered as provided by the Eminent Domain Code.*

### Fee Simple Interest

*"Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat."* [1]

### Exposure Time

*"The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective opinion based upon an analysis of past events assuming a competitive and open market."* [2]

### Marketing Time

*"An opinion of the amount of time it might take to sell a property interest in real estate at the concluded market value level during the period immediately after the effective date of an appraisal."* [3]

---

1 The Appraisal of Real Estate, Appraisal Institute, Thirteenth Edition, 2008, Page 111.
2 Uniform Standards of Professional Appraisal Practice (USPAP), The Appraisal Foundation, 2012 – 2013 Edition.
3 Ibid.



## LOCALITY



## REGIONAL DESCRIPTION

### General

The subject property is located within the City of Allentown, Lehigh County, Pennsylvania. Lehigh County is situated in the eastern part of the State and is part of the Lehigh Valley Region, which is also known as the Allentown-Bethlehem-Easton, PA-NJ Metropolitan Statistical Area. The MSA includes Lehigh and Northampton Counties in eastern Pennsylvania and Warren County on the western edge of New Jersey. The subject area is approximately 50 miles north of Philadelphia, 80 miles east of Harrisburg, Pennsylvania's capital, and 70 miles west of New York City.

Lehigh Valley is bounded on the north by Blue Mountain, a ridge of the Appalachian Mountain range and on the south by South Mountain, a ridge that cuts through the southern portions of the two counties. The Region is named for the Lehigh River, which traverse through the northeastern boundary of Lehigh County.



## LOCALITY - (Continued)

Lehigh County covers an estimated land area of approximately 349 square miles with 347 square miles of land and two square mile of water. The County is divided into 15 townships, eight boroughs and two main cities, including Allentown and Bethlehem, which is situated in both Lehigh and Northampton Counties.

The City of Allentown is the largest city in terms of both population and land area, and also serves as the County Seat. Allentown is the state's third largest city behind Philadelphia and Pittsburgh.

### Population

As of 2010, the Allentown-Bethlehem-Easton, PA-NJ MSA had a population estimate of 821,173 people and experienced an increase of 10.9% since the 2000 Census. Lehigh County had a 2010 population estimate of 349,497 persons, indicating an increase of 12.0% since the 2000 Census. Allentown had a 2010 population of 118,032 persons, which represents 10.7% increase since the 2000 Census. The MSA (Lehigh Valley Region) has generally experienced steady population growth trends with the city and the county mirroring similar levels of growth.

### Transportation

The primary interstate highways serving Lehigh County include I-78 and I-476, which is the northeast extension of the Pennsylvania Turnpike. I-78 provides limited access road service from Harrisburg to the southwest, through the Lehigh Valley, to northern New Jersey to the northeast. I-476 extends 131 miles from Chester to the south, through Allentown, and extends further north to the Scranton-Wilkes Barre area. Primary local roads include U.S. Routes 22 and 222, and State Routes 33, 100, 145, 309 and 611.

The primary air transportation serving this area is available at the Lehigh Valley International Airport (ABE), which is centrally located near U.S. Route 22 in Hanover Township. CSX Transportation/Norfolk-Southern Railway provide rail freight service to Lehigh County. An extensive number of trucking companies operate throughout this area. Public transportation is available in Lehigh County through a bus network system, which includes Lehigh and Northampton transit Authority (LANTA). Greyhound Bus Lines providers interstate bus service.

### Employment/Economic Base

The Allentown-Bethlehem-Easton, PA-NJ MSA comprises a labor force of 427,841 people, with an unemployment rate of 8.0% as of May, 2012. Lehigh County has a labor force of approximately 182,008 people and an average unemployment rate estimate of 7.9% during this same time period.



**LOCALITY** - (Continued)

From 1990 through 2008, the Allentown-Bethlehem-Easton, PA-NJ MSA's unemployment rate remained fairly stable, ranging from 3.7% to 7.7%. The unemployment rate has risen significantly since 2008 with an average unemployment rate of 9.2% in 2010. The unemployment picture has not improved significantly since 2010 as unemployment rates for the MSA was 8.7% in 2011.

The County unemployment picture generally mirrored that of the MSA with increasing unemployment trends between 2008 through 2010. The unemployment picture has not improved significantly since 2010 as unemployment rates for the County was 8.7% in 2011. Although the County's unemployment rate had begun to decrease in 2011, it is still at 20-year highs. Pertinent unemployment rates are summarized as follows.

| AVERAGE UNEMPLOYMENT RATES | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Area** | **2005** | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** |
| Lehigh County | 4.9% | 4.5% | 4.4% | 5.7% | 8.6% | 9.1% | 8.7% |
| MSA | 4.9% | 4.6% | 4.4% | 5.6% | 8.6% | 9.2% | 8.7% |
| Pennsylvania | 5.0% | 4.5% | 4.4% | 5.4% | 8.0% | 8.5% | 7.9% |
| *Source: U.S. Department of Labor, Bureau of Labor Statistics* | | | | | | | |

As reflected in the national trend, this area began to experience an increase in unemployment in 2008, which continued through 2011.

The Lehigh Valley is centrally located with ease of access and close proximity to several of the largest markets, population centers, airports, terminals, railways and seaports in the United States. The Lehigh Valley is also one of the largest areas on the east coast for the location of warehouses and distribution centers. Companies that own and/or operate warehouses or distribution centers in the Lehigh Valley include Amazon.com, B. Braun, Boston Beer Company, BMW, Bridgestone, FedEx SmartPost, Home Depot, J.C. Penney, Nestle Purina, ShopRite. The Coca-Cola Company, True Value, Uline and many others. Most of these distribution centers are located along U.S. Route 22, I-78 and I-476 corridors. Leading industry sectors within the Lehigh Valley include medical, printing, technology, food products, electronics and plastics.



**LOCALITY** - (Continued)



## NEIGHBORHOOD DESCRIPTION

A neighborhood is defined as a group of complementary land uses; a congruous grouping of inhabitants, buildings, or business enterprises. The subject property is more specifically located along the eastern side of Ivy Street, east of North Front Street and bounded by the railroad at the subject property's eastern site elevation. The adjoining uses include the following:

*North* —   Residential dwellings, church, undeveloped land

*South* —   Representative industrial land occupants include Acme Cryogenics, Banner Tire Systems, Gardner Cryogenics, Creative Fence and American Carbonation

*West* —   Attached residential dwellings with new residential construction at New Jordon Creek carriage houses, institutional churches and schools, such as St. Mary's Parish Center to the south

*East* —   Railroad and industrial land uses bordering the Lehigh River

- 12 -



## LOCALITY - (Continued)

The surrounding neighborhood includes a diversified mix of higher density of residential and commercial sections in the City of Allentown. The subject site is accessible to the major highways, public utilities and is situated in an urban area of the City of Allentown.

## AMERICAN PARKWAY PROJECT

American Parkway is a roadway project which is incomplete. It is finished on the east and west sides of the Lehigh River through Allentown. However, a bridge project and connecting roads have been proposed to tie these east and west sections together. The project scope includes:



Construction of a new four-lane, controlled access road from its current terminus at Front Street to the newly constructed section connecting to Airport Road.

A new bridge across the Lehigh River and railroad.

A new bridge carrying Front Street over American Parkway.

Three south approach structures over the existing rail line.

Several retaining walls, noise walls, and new interchanges at Front Street and Dauphin Street.

The subject property is within the area designated as Phase 3 which requires a new entrance road to access the parkway on the west side of the river with the access road being connected to Fullerton Avenue.

- 13 -



## THE SUBJECT PROPERTY

### OWNERSHIP AND OCCUPANCY

The subject property is in the ownership of Lehigh Valley Properties and is owner-occupied as a construction material storage and recycling site.

There have been no other real property transfers of the subject property disclosed within the last three years. There has been no disclosure for this appraisal that the appraised property is presently listed for sale, subject to an agreement of sale or purchase option. Furthermore, there have been no major building improvements completed within the last three years.

### LAND – BEFORE TAKING

The subject site consists of three contiguous tax parcels forming an irregular-shaped site with a land area of 4.433 acres fronting and accessible along the eastern side Ivy Street and a second entrance gate at the southern elevation from a private road. The site has a level topography at the western site elevation with Ivy Street and a rolling to sloping topography as the site extends eastward, below the street grade elevation. Available utilities include electric, public water and sewer, and telephone service. Typical utility easements are assumed. The following tax map provides an overview of the subject site before the taking.



## TAX MAP



**THE SUBJECT PROPERTY** - (Continued)

**LAND – AFTER TAKING**

According to the Declaration of Taking, Exhibit B, which presents a site plan for the subject area that is intended as a taking under the Eminent Domain Code of 1964. Subsequent to the taking, the subject property will consist of two noncontiguous parcels separated by an unidentified feeder road right-of-way. The land area or remainder, after the taking, will be 3.451 acres. The taking area (shaded below) is identified as 0.982 acre. The connection of Fullerton Street through the subject property is to connect to the American Parkway. In addition, there will be slope easements on both sides of the right-of-way containing a total land area of 0.365 acre.



**SITE PLAN**

- 15 -



### THE SUBJECT PROPERTY - (Continued)

The remainder will more specifically include:

- 1.315 acres along the westerly side of the proposed road right-of-way and bounded by the easterly side of Ivy Street. Access to the westerly side of the site will remain virtually the same from Ivy Street.

- The eastern noncontiguous parcel divided by the right-of-way will comprise 2.136 acres and reportedly have access from the proposed bi-directional road right-of-way. However, the northern/eastern property elevations may have greater restrictions upon access and visibility depending upon the final design and construction of the proposed road right-of-way.

### Floodplain

The subject property falls within Zone X Community Panel No. 42077C0252F, dated July 16, 2004. Zones B, C, and X are the flood insurance rate zones that correspond to areas outside of the 100 and 500-year flood zones with a 1% or less annual chance of flooding. No Base Flood Elevations or depths are shown within this zone. Zone X is not considered a Flood Hazard area.



**THE SUBJECT PROPERTY** - (Continued)



# FLOOD ZONE MAP

- 17 -



### THE SUBJECT PROPERTY - (Continued)

### Zoning

The subject site is zoned I-3, General Industrial District with the purpose of this district is to provide areas suitable for a wide variety of industrial and related uses with controls necessary for insuring sound industrial development.



Permitted industrial uses include manufacturing, processing, assembly and warehousing of various products and materials including but not limited to metals, wood, paper, pharmaccuticals, polymers, glass, food and beverage, textiles, electrical and electronic, and similar uses as listed in Article 1313 of the zoning ordinance. Site requirements include:

|  |  |
| --- | --- |
| **Minimum Requirements** | |
| Lot Area: | 10,000 sq. ft. |
| Lot Width: | 80 feet |
| Front Yard: | 20 feet |
| Side Yards: | 8 feet |
| Rear Yard: | 10 feet |
| **Maximum Requirements** | |
| Building Height: | 50 feet |
| Building Coverage: | 70% |

- 18 -



## THE SUBJECT PROPERTY - (Continued)

Based upon a review of the zoning ordinance, it appears that the subject property represents a legally permitted use.

## ASSESSMENT AND TAXES

The subject property is identified as three tax parcels on the Lehigh County tax assessment records and the 2012 assessment is summarized as follows:

| Property Address | Lot | Tax Parcel Number | Assessed Value |
|------------------|-----|-------------------|----------------|
| 901 Ivy Street | 5B | 640736994963 | $27,000 |
| 919 Ivy Street | 5A | 640736869299 | $2,600 |
| 929-933 Ivy Street | 5 | 640736880126 | $2,600 |
| Total | | | $32,200 |

The taxable value for the subject property is $32,200. The combined tax rate for the subject property is 111.612 per $1,000 of assessed value and annual real estate taxes are $3,594.



**THE SUBJECT PROPERTY** - (Continued)



**PROPERTY FRONTAGE ALONG IVY STREET, FACING NORTH**



**VIEW ALONG IVY STREET, FACING SOUTH**

- 20 -



## THE SUBJECT PROPERTY - (Continued)



## WESTERN SITE ELEVATION, LOT 5



## SOUTH ACCESS GATE TO LOT 5A (PART TAKEN)

- 21 -



## THE SUBJECT PROPERTY - (Continued)



### CENTRAL SITE ELEVATION, FACING WEST



### CENTRAL SITE ELEVATION, FACING SOUTH



**THE SUBJECT PROPERTY** - (Continued)



**SOUTHEASTERN SITE ELEVATION, LOT 5 B**



**NOTHERN SITE ELEVATION, LOT 5 B**

- 23 -



**THE SUBJECT PROPERTY** - (Continued)



**MATERIAL STORAGE AREA, SOUTH-CENTRAL SITE ELEVATION**



**MATERIAL STORAGE AREA, LOT 5, FACING SOUTHEAST**

- 24 -



## HIGHEST AND BEST USE

Basic to the valuation of any property is the determination of the property's highest and best use. This is defined as:

*"The reasonably probable and legal use of vacant land or an improved property, that is physically possible, appropriately supported, and financially feasible and that results in the highest value."* [4]

The highest and best use of the site as if vacant and available for development is analyzed initially and then followed by the highest and best use of the site as improved. The three primary land use categories of residential, commercial and industrial are typically evaluated within the two sections. Since the subject property is comprised primarily of undeveloped land, the highest and best use as if vacant is applicable before and after the taking.

### BEFORE THE TAKING

The subject property is zoned I-3, General Industrial District and the zoning does not impact the property after the taking as it will remain the same. However, the physical characteristics of the property will change significantly. Prior to the taking, the property consists of three contiguous parcels that comprise 4.433 acres with access and frontage along Ivy Street as well as a secondary access point to the southern property elevation from a separate road pattern that is part of a private driveway. The highest and best use is continued use for material storage and recycling purposes.

### AFTER THE TAKING

The site remainder after the taking will comprise 3.451 acres with frontage and accessibility only along Ivy Street. The site will further be bisected by the road right-of-way reducing the western site elevation to approximately 1.315 acres.  The northern site elevation will comprise 2.136 acres. Access to the eastern site elevation is proposed; however, depending upon topography and site elevations, it is unclear specifically where the road access would exist or if other limitations would apply.

To a certain extent, the property represents an assembled economic unit.  According to the Impact Statement made by Steven A. Pany PE of Pany & Lentz Engineering Company, dated February 2, 2012, the indicted assessment on the impact of the subject area to be taken represents a constraint upon utilization of the remaining property to adequately serve as a recycling operation. Mr. Pany notes "Neither remnant parcel separately nor in combination can accommodate a recycling use similar to the current operation."

---

4 The Appraisal of Real Estate, Appraisal Institute, Thirteenth Edition, 2008, Pages 277 - 278.



## HIGHEST AND BEST USE – (Continued)

The impact of the road pattern and the taking of 0.982 acre as well as steep slope easements (0.365 acre) impact the remainder of the site for continued use as it was originally designed. Under the Uniform Economic Unit Doctrine, the subject site, before the taking, adequately serves as a construction debris and material recycling and storage operation. The convenient access to major highways and to the area's construction projects are pertinent to this specific site and use.

Not only distance to major customers but also the drive time and reduced number of traffic signal intersections improves the efficiencies and logistics of delivery of product and reduces costs to the construction companies. Considering the Impact Statement provided by Pany as well as the Binswanger Company's familiarity with valuation of quarry sites, batch plant, and concrete production and crushing plants, the land area of the subject after the taking would clearly indicate such operations would not be sufficient. On-site storage of material may also further be limited as the height of construction debris and containment would add an additional burden to prohibit material from being distributed onto the newly proposed road.

Based upon a review of all the information and considering current economic conditions, the highest and best use after the taking is not specifically known at this time. The site configuration and accessibility will likely be restricted and the remaining topography may not feasibility support new construction for industrial purposes.

- 26 -



## THE APPRAISAL PROCESS

The Appraisal Process attempts to estimate a market value for the property utilizing all available approaches. The three approaches normally considered are the Cost Approach, the Sales Comparison Approach and the Income Capitalization Approach. An indication of market value can be developed through each of these approaches.

The *Cost Approach* to value encompasses the estimation of land value and the depreciated reproduction or replacement cost of the building and site improvements. In regard to cost new, reproduction cost is normally utilized, and considers replacing the exact same physical structure on the property as opposed to the replacement cost. Replacement cost is the cost to replace the same utility, but not with the exact same materials that are found in the subject.

The *Sales Comparison Approach* develops a value for the subject property through a comparison with similar properties which have sold to as close a time period to this valuation date as possible. All factors of comparability are to be judged and adjusted in order to indicate a value for the subject property.

The final approach to value is the *Income Capitalization Approach*, which attempts to indicate a value for the entire property through its capability to produce a rental and an income stream. This analysis develops the market rental that could be attained if the subject were exposed in the open market for rent and after making deductions for all expenses, arriving at a net income which is then converted to an indication of value through a capitalization process.

After an indication of value is developed through all three approaches, a final estimate of value must be developed. This final estimate of value is normally based upon the type of property, the purpose of the appraisal and the quantity and quality of the information, as presented in each of the individual three approaches.

In regard to the subject property, this Appraisal Report utilizes only the Sales Comparison Approach in determining an opinion of fair market value before and after the taking. The subject property does not include building improvements and it is not of investment grade nor are leases applicable to this type of site. Therefore, the Cost and Income Capitalization Approaches would not be considered reliable methods of valuation for the subject property.

BINSWANGER

## SALES COMPARISION APPROACH

This method develops an indication of value for the subject property through a comparison with comparable land sales. Comparable sales which are selected should be competitive properties and have sold as close to the date of appraisal as possible.

As no two properties are exactly alike, a comparison of comparable sales requires adjustments which reflect upon market value. Unimproved properties are normally adjusted on a unit rate basis, being a price per acre of land area or price per square foot of land area. That rate is developed by dividing the total sale price by the total land area.

A search for comparable properties extended within a competitive geographical area for the property. Based upon the size and use of the subject property, a search within Lehigh County was made for comparable sales. An extensive number of comparable sales and offerings were reviewed in order to establish an indication of value under this Approach.

The Sales Comparison Approach is divided into two sections presenting comparable market data as it relates to the fair market value of a replacement site for the subject property as well as market data which is utilized to determine the value of the property subsequent to the taking.

## LAND VALUATION BEFORE TAKING

In estimating land value, comparable industrial land sales and offerings were researched for comparison to the subject site prior to the taking. The subject property comprises 4.433 acres and was utilized for industrial purposes. The valuation of the subject property under this analysis pertains to acquiring an adequately suitable replacement site that would provide equivalent functional utility for the specific purpose of recycling and storage of construction materials and debris. The following is information on the most pertinent land comparables utilized in determining a reasonable and appropriate land value for the subject property under this scenario.

- 28 -

04/30/2013 TUE 15:17 FAX 610 660 5040 Nicholas R Sabatine Esq



## SALES COMPARISION APPROACH – (Continued)

**LAND SALE NUMBER 1**



### SALE INFORMATION

| | | | |
|---|---|---|---|
| Address: | 540 Union Boulevard<br>Allentown, PA | Grantor: | OM Development<br>Corporation |
| | | Grantee: | AC Drive-In Holdings,<br>LLC |
| County: | Lehigh | Sale Date: | March, 2012 |
| Property Type: | Land | Sale Price: | $1,750,000 |
| Property Sub'Type: | Industrial | Financing: | Conventional |
| Tax Parcel: | 640767821628 | Deed: | 10496 |

### SITE INFORMATION

| | | | |
|---|---|---|---|
| Land Area (Acres): | 12.63 | Sale Price/Acre: | $138,559 |
| Land Area (Sq. Ft.): | 550,163 | Sale Price/Sq. Ft.: | $3.18 |
| Shape: | Irregular | | |
| Topography: | Level to rolling | | |
| Utilities: | All public services available | | |
| Zoning: | B/LI, Business/Light Industrial District | | |

### COMMENTS

The site is situated along the southeasterly side of Union Boulevard with a driveway access to a former movie theater. The property also has frontage along Ellsworth Street. The site has a steady decline toward the southern elevation. The land area indicated is derived from the deed.

- 29 -



## SALES COMPARISION APPROACH – (Continued)



**LAND SALE NUMBER 2**

### SALE INFORMATION

| | | | |
|---|---|---|---|
| Address: | 7457 Industrial Park Way (Lot 1B) | Grantor: | Polaris South Realty, LP |
| | Macungie, PA | Grantee: | Edward C. Wigfield, Jr. |
| County: | Lehigh | Sale Date: | June, 2011 |
| Property Type: | Land | Sale Price: | $569,400 |
| Property SubType: | Industrial | Financing: | Conventional |
| Tax Parcel: | 546398470193 | Deed: | 17165 |

### SITE INFORMATION

| | | | |
|---|---|---|---|
| Land Area (Acres): | 3.79 | Sale Price/Acre: | $150,237 |
| Land Area (Sq. Ft.): | 165,092 | Sale Price/Sq. Ft.: | $3.45 |
| Shape: | Rectangular | | |
| Topography: | Level | | |
| Utilities: | All public services available | | |
| Zoning: | ORLIC- Office Research Light Industrial Center | | |

### COMMENTS

Located on the north side of Industrial Park Way, west of Schoeneck Road in Lower Macungie Township. Property is bordered by industrial land uses and located 2.6 miles south of U.S. Route 222 and five miles south of the I-78/Route 100 Interchange.



## SALES COMPARISION APPROACH – (Continued)



**LAND SALE NUMBER 3**

### SALE INFORMATION

| | | | |
|---|---|---|---|
| Address: | 7240 Windsor Drive Allentown, PA | Grantor: | North Star Real Estate Investments, LP |
| | | Grantee: | Thomas A. & Anna Yorie |
| County: | Lehigh | Sale Date: | April, 2011 |
| Property Type: | Land | Sale Price: | $340,051 |
| Property SubType: | Industrial | Financing: | Conventional |
| Tax Parcel: | 546612728695 | Deed: | 11439 |

### SITE INFORMATION

| | | | |
|---|---|---|---|
| Land Area (Acres): | 2.038 | Sale Price/Acre: | $166,855 |
| Land Area (Sq. Ft.): | 88,775 | Sale Price/Sq. Ft.: | $3.83 |
| Shape: | Rectangular | | |
| Topography: | Level, partially wooded | | |
| Utilities: | All public services available | | |
| Zoning: | Light Industrial District | | |

### COMMENTS

Located in the Iron Run Corporate Center on the south side of the road, south of Tilghman Street, approximately one mile from the I-78/Route 100 Interchange in Upper Macungie Township.

 BINSWANGER

## SALES COMPARISION APPROACH – (Continued)



### LAND SALE NUMBER 4

**SALE INFORMATION**

| | | | |
|---|---|---|---|
| Address: | 7231 Windsor Drive Allentown, PA | Grantor: | Polaris Iron Run, LP |
| | | Grantee: | PPL Electric Utilities Corporation |
| County: | Lehigh | Sale Date: | December, 2010 |
| Property Type: | Land | Sale Price: | $1,896,000 |
| Property SubType: | Industrial | Financing: | Conventional |
| Tax Parcel: | 546612588732 | Deed: | 44985 |

**SITE INFORMATION**

| | | | |
|---|---|---|---|
| Land Area (Acres): | 11.85 | Sale Price/Acre: | $160,000 |
| Land Area (Sq. Ft.): | 516,186 | Sale Price/Sq. Ft.: | $3.67 |
| Shape: | Irregular | | |
| Topography: | Level to sloping | | |
| Utilities: | All public services available | | |
| Zoning: | Light Industrial District | | |

**COMMENTS**

Lots 58A, 58B, 58C and 58D located in the Iron Run Corporate Center on the west side of the road, south of Tilghman Street, approximately one mile from the I-78/Route 100 Interchange in Upper Macungie Township.



## SALES COMPARISION APPROACH – (Continued)

**LAND SALE NUMBER 5**



### SALE INFORMATION

| Address: | N/S Grim Road (NWQ Route 100/222) Breinigsville, PA | Grantor: | Frederick J. Jaindl |
|---|---|---|---|
| | | Grantee: | Liberty Property, LP |
| County: | Lehigh | Sale Date: | June, 2010 |
| Property Type: | Land | Sale Price: | $5,884,564 |
| Property SubType: | Industrial | Financing: | Conventional |
| Tax Parcel: | 545591629425 | Deed: | 20803 |

### SITE INFORMATION

| Land Area (Acres): | 19.42 | Sale Price/Acre: | $303,016 |
|---|---|---|---|
| Land Area (Sq. Ft.): | 845,935 | Sale Price/Sq. Ft.: | $6.96 |
| Shape: | Irregular | | |
| Topography: | Level to rolling | | |
| Utilities: | All public services available | | |
| Zoning: | Light Industrial District | | |

### COMMENTS

Broker was Gelcor Realty, Inc. The property was purchased by Liberty Property Trust to be utilized as a parking lot for their industrial building located at 650 Boulder Drive. Deed area indicated. Property sits at the northern terminus of Messer Road in Upper Macungie Township.

- 33 -



## SALES COMPARISION APPROACH – (Continued)



**LAND SALE NUMBER 6**

### SALE INFORMATION

| | | | |
|---|---|---|---|
| Address: | 2843 Mitchell Avenue<br>Allentown, PA | Grantor: | Hajomi Company |
| | | Grantee: | N/A |
| County: | Lehigh | Sale Date: | Offering |
| Property Type: | Land | Sale Price: | $1,500,000 |
| Property SubType: | Industrial | Financing: | N/A |
| Tax Parcel: | 549684493485 | Deed: | N/A |

### SITE INFORMATION

| | | | |
|---|---|---|---|
| Land Area (Acres): | 6.88 | Sale Price/Acre: | $218,023 |
| Land Area (Sq. Ft.): | 299,693 | Sale Price/Sq. Ft.: | $5.01 |
| Shape: | Irregular | | |
| Topography: | Level to rolling, wooded | | |
| Utilities: | All public services available | | |
| Zoning: | I-2, Limited Industrial District | | |

### COMMENTS
Broker is the Fredrick Group. Property is located less than 1.4 driving miles off of Lehigh Street (Exit 57) of I-78 in the southern section of Allentown.

- 34 -



## SALES COMPARISION APPROACH – (Continued)



| LAND SALE NUMBER 7 | | | |
|---|---|---|---|

### SALE INFORMATION

| | | | |
|---|---|---|---|
| Address: | 171 Oldt Road | Grantor: | Fred J. Jaindl |
| | Breinigsville, PA | | |
| | | Grantee: | N/A |
| | | | |
| County: | Lehigh | Sale Date: | Offering |
| Property Type: | Land | Sale Price: | $1,639,200 |
| Property SubType: | Industrial | Financing: | N/A |
| Tax Parcel: | 545566695106 | Deed: | N/A |

### SITE INFORMATION

| | | | |
|---|---|---|---|
| Land Area (Acres): | 7.129 | Sale Price/Acre: | $229,934 |
| Land Area (Sq. Ft.): | 310,539 | Sale Price/Sq. Ft.: | $5.28 |
| Shape: | Slightly irregular | | |
| Topography: | Level to Rolling | | |
| Utilities: | All public services available | | |
| Zoning: | Light Industrial District | | |

### COMMENTS
Broker is Gelcor Realty, Inc. Located in Lehigh Valley West Park at the northwest corner of Nestle Way approximately 1.3 miles southwest of I-78/ Route 100 interchange in Upper Macungie Township.



## SALES COMPARISION APPROACH – (Continued)



**COMPARABLE LAND SALES MAP - BEFORE THE TAKING**

| COMPARABLE LAND SALES ADJUSTMENT GRID - BEFORE TAKING | | | | | | | |
|---|---|---|---|---|---|---|---|
| SALE NO. | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| SALE DATE | Mar-12 | Jun-11 | Apr-11 | Dec-10 | Jun-10 | Offering | Offering |
| LAND AREA - ACRES | 12.630 | 3.790 | 2.038 | 11.850 | 19.420 | 6.880 | 7.129 |
| PRICE/ACRE | $138,559 | $150,237 | $166,855 | $160,000 | $303,016 | $218,023 | $229,934 |
| ADJUSTMENT FACTORS | | | | | | | |
| UNADJUSTED UNIT RATE | $138,559 | $150,237 | $166,855 | $160,000 | $303,016 | $218,023 | $229,934 |
| FINANCING/CONDITIONS | 0% | 0% | 0% | 0% | -20% | -10% | -10% |
| FINANCING ADJ. UNIT RATE | $138,559 | $150,237 | $166,855 | $160,000 | $242,413 | $196,221 | $206,941 |
| TIME | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| TIME ADJ. UNIT RATE | $138,559 | $150,237 | $166,855 | $160,000 | $242,413 | $196,221 | $206,941 |
| OTHER ADJUSTMENTS | | | | | | | |
| LOCATION | 10% | 20% | 0% | 0% | -20% | 5% | 0% |
| PHYSICAL ITEMS | 25% | 0% | 0% | 25% | 0% | 0% | 0% |
| NET OTHER ADJUSTMENT | 35% | 20% | 0% | 25% | -20% | 5% | 0% |
| ADJUSTED UNIT RATE | $187,055 | $180,284 | $166,855 | $200,000 | $193,930 | $206,032 | $206,941 |



## SALES COMPARISION APPROACH – (Continued)

### Explanation of Adjustments

*Financing/Conditions* - An adjustment for financing is required only where a transaction involved financing which affected the sales price. An adjustment would be made on the premise that the subject property would be sold on a cash equivalent basis. Conditions of sale adjustments usually reflect the motivations of the buyer and seller where they are unusual.

Sale 5 was adjusted downward as the property was a key component to an existing industrial facility which required parking and therefore it appears that a premium price was paid. Sales 6 and 7 were adjusted downward as they are offerings prices. Actual sale prices are likely to be lower.

*Time* - A time adjustment was considered for each comparable sale to represent any change in market conditions between the comparable sale date and the effective date of the valuation. No time adjustment was made where similar market conditions exist.

An effort was made to consider property transactions as close to the effective valuation date as possible. Where sale transaction dates occurred subsequent to the effective valuation date, market conditions are considered similar and price expectations are in-line with existing sale transactions. Also, those property transactions that may have occurred subsequent the effective valuation date were likely exposed to the market at the time of the effective valuation date. Therefore, the transactions are considered pertinent to the valuation process.

*Location* - Each location was analyzed as to the general market conditions, transportation, compatibility of surrounding land uses and potential future trends. That consideration was related to the subject property and any significant differences were compensated for by an adjustment. Proximity to major road patterns and quality of access, via the number traffic signals, were considered in the adjustments for location. Three of the seven comparables were considered inferior. Only one sale was considered superior. Sale 5 is located at the northwestern quadrant of an interchange with immediate access to Route 100/222. Therefore, a downward adjustment was applicable.

*Physical Characteristics* - Where physical differences, which affect marketability, exist, an appropriate adjustment was made to each comparable sale in relationship to the subject property. Adjustments to the comparable land sales were made for physical items pertaining to size, topography, frontage, utilities and access but also consider overall usability of the land area where other impediments to development may be applicable.

In some cases where land areas were significantly larger and the site configuration inferior, upward adjustments were applicable. In most cases, the comparable sites



## SALES COMPARISION APPROACH – (Continued)



**LAND SALE NUMBER 8**

### SALE INFORMATION

| | | | |
|---|---|---|---|
| Address: | 8009 Quarry Road Alburtis, PA | Grantor: | Althea Walbert |
| | | Grantee: | Jaindl Farms |
| County: | Lehigh | Sale Date: | December, 2011 |
| Property Type: | Land | Sale Price: | $1,100,000 |
| Property SubType: | Industrial | Financing: | Conventional |
| Tax Parcel: | 546357637014 546358630254 | Deed: | 39771 |

### SITE INFORMATION

| | | | |
|---|---|---|---|
| Land Area (Acres): | 27.47 | Sale Price/Acre: | $40,044 |
| Land Area (Sq. Ft.): | 1,196,593 | Sale Price/Sq. Ft.: | $0.92 |
| Shape: | Irregular | | |
| Topography: | Level to rolling | | |
| Utilities: | All public services available | | |
| Zoning: | Highway Industrial | | |

### COMMENTS

Two contiguous parcels forming an irregular-shaped site bounded by railroad at the southern and eastern elevations. Zoned industrial with limited frontage and access along the north side of Alburtis Road/Penn Avenue.

- 39 -



## SALES COMPARISION APPROACH – (Continued)

### LAND SALE NUMBER 9



**SALE INFORMATION**

| | | | |
|---|---|---|---|
| Address: | 1115 American Parkway Allentown, PA | Grantor: | Tropicana Pennsylvania, LLC |
| | | Grantee: | LV Baseball, LP |
| County: | Lehigh | Sale Date: | March, 2011 |
| Property Type: | Land | Sale Price: | $504,332 |
| Property SubType: | Industrial | Financing: | Conventional |
| Tax Parcel: | 640769981892 | Deed: | 10367 |

**SITE INFORMATION**

| | | | |
|---|---|---|---|
| Land Area (Acres): | 18.00 | Sale Price/Acre: | $28,018 |
| Land Area (Sq. Ft.): | 784,080 | Sale Price/Sq. Ft.: | $0.64 |
| Shape: | Irregular, partly wooded | | |
| Topography: | Level to sloping | | |
| Utilities: | All public services available | | |
| Zoning: | B/LI, Business/Light Industrial District | | |

**COMMENTS**

Situated on the south side of the road at the entrance to Iron Pig Way. Subject to electrical and pipeline utility easements. Property is located adjacent to Coca Cola Park, stadium for the Iron Pigs and includes macadam paved parking. Tropicana originally proposed a casino at this location, but was unable to get the needed licenses and permits.



## SALES COMPARISION APPROACH – (Continued)



**LAND SALE NUMBER 10**

### SALE INFORMATION

| | | | |
|---|---|---|---|
| Address: | 737 - 747 N. Gilmore Street Allentown, PA | Grantor: | Malena S. Noemis |
| | | Grantee: | Lehigh Land Developers |
| County: | Lehigh | Sale Date: | December, 2010 |
| Property Type: | Land | Sale Price: | $18,000 |
| Property SubType: | Industrial | Financing: | Conventional |
| Tax Parcel: | 640776890818 | Deed: | 8086 |

### SITE INFORMATION

| | | | |
|---|---|---|---|
| Land Area (Acres): | 0.370 | Sale Price/Acre: | $48,649 |
| Land Area (Sq. Ft.): | 16,117 | Sale Price/Sq. Ft.: | $1.12 |
| Shape: | Rectangular, wooded | | |
| Topography: | Level | | |
| Utilities: | All public services available | | |
| Zoning: | B/LI, Business Light Industrial District | | |

### COMMENTS

Urban site at NEC N. Gilmore and E. Carey Street bounded by Jeans Street to the north, bordered by industrial and residential land uses.

- 41 -



## SALES COMPARISION APPROACH – (Continued)



**LAND SALE NUMBER 11**

### SALE INFORMATION

| | | | |
|---|---|---|---|
| Address: | 7533 Ruppsville Road Macungie, PA | Grantor: | Jean Hess Spence |
| | | Grantee: | N/A |
| County: | Lehigh | Sale Date: | Offering |
| Property Type: | Land | Sale Price: | $750,000 |
| Property SubType: | Industrial | Financing: | N/A |
| Tax Parcel: | 546344071268 | Deed: | N/A |

### SITE INFORMATION

| | | | |
|---|---|---|---|
| Land Area (Acres): | 21.11 | Sale Price/Acre: | $35.528 |
| Land Area (Sq. Ft.): | 919,352 | Sale Price/Sq. Ft.: | $0.82 |
| Shape: | Irregular | | |
| Topography: | Level | | |
| Utilities: | All public services available | | |
| Zoning: | LI, Light Industrial District | | |

### COMMENTS

Broker is Prudential Patt White Real Estate. LI zoned industrial site bisected by electrical transmissions lines immediately north of U.S. Route 222 Bypass. Accessed via Morris Court and located at the southern terminus of the road and bounded by Route 222 but situated below the highway. South of West Park Business Center.



**SALES COMPARISION APPROACH** – (Continued)



**COMPARABLE LAND SALES MAP-AFTER TAKING**

| COMPARABLE LAND SALES ADJUSTMENT GRID - AFTER TAKING | | | | |
|---|---|---|---|---|
| **SALE NO.** | 8 | 9 | 10 | 11 |
| **SALE DATE** | Dec-11 | Mar-11 | Dec-10 | Offering |
| **LAND AREA - ACRES** | 27.47 | 18.00 | 0.37 | 21.11 |
| **PRICE/ACRE** | $40,044 | $28,018 | $48,649 | $35,528 |
| **ADJUSTMENT FACTORS** | | | | |
| UNADJUSTED UNIT RATE | $40,044 | $28,018 | $48,649 | $35,528 |
| FINANCING/CONDITIONS | 0% | 0% | 0% | 0% |
| FINANCING ADJ. UNIT RATE | $40,044 | $28,018 | $48,649 | $35,528 |
| TIME | 0% | 0% | 0% | 0% |
| TIME ADJ. UNIT RATE | $40,044 | $28,018 | $48,649 | $35,528 |
| OTHER ADJUSTMENTS | | | | |
| LOCATION | 25% | 0% | 10% | 10% |
| PHYSICAL ITEMS | -25% | 0% | -20% | 0% |
| NET OTHER ADJUSTMENT | 0% | 0% | -10% | 10% |
| ADJUSTED UNIT RATE | $40,044 | $28,018 | $43,784 | $39,081 |

- 43 -



### SALES COMPARISION APPROACH – (Continued)

**Explanation of Adjustments**

***Financing/Conditions*** - An adjustment for financing is required only where a transaction involved financing which affected the sales price. An adjustment would be made on the premise that the subject property would be sold on a cash equivalent basis. Conditions of sale adjustments usually reflect the motivations of the buyer and seller where they are unusual.

***Time*** - A time adjustment was considered for each comparable sale to represent any change in market conditions between the comparable sale date and the effective date of the valuation. No time adjustment was made where similar market conditions exist.

Where sale dates occurred within a reasonable time frame of the effective date, the transaction information was utilized as the properties would likely be placed under agreement or exposed to the market as an offering well before the actual sale date.

***Location*** - Each location was analyzed as to the general market conditions, transportation, compatibility of surrounding land uses and potential future trends. That consideration was related to the subject property and any significant differences were compensated for by an adjustment.

Two of the sales required upward adjustments for the inferior locations and access to major road patterns.

***Physical Characteristics*** - Where physical differences, which affect marketability, exist, an appropriate adjustment was made to each comparable sale in relationship to the subject property.  Adjustments to the comparable land sales were made for physical items pertaining to size, topography, frontage, utilities and access.

Sales 2 and 8 required downward adjustments for physical characteristics relating to usable land areas, site improvements or in the case of Sale 10, the significantly smaller land area which typically results in a higher unit rate. All of the sales are impacted by restrictions that include easements as well as limitations on physical characteristics relating to those easements.

- 44 -


**BINSWANGER**

### SALES COMPARISION APPROACH – (Continued)

#### Correlation of Land Value - After Taking

Three sale transactions and one offering were considered in the valuation of an industrial site that would be impacted by restrictions upon use similar to that of the subject property. The market data for this property analysis indicated an unadjusted unit rate range from $28,018 to $48,649. After considering the necessary adjustments, the unit rate range was more narrowly defined as:

| | |
|---|---|
| Unit Rate - Low | $28,018 |
| Unit Rate - High | $43,784 |
| **Unit Rate - Mean** | **$37,732** |

Based upon the comparable market data presented herein, a land value range predicated upon the adjusted mean of the data is supported for the subject property. Therefore, a unit rate range of $35,000 to $40,000 is concluded for this analysis.

Applying that unit rate to the subject land area, after the taking, of 3.451 acres indicates a land value range from of $121,000 to $138,000. The value is concluded within the overall range at **$130,000.**



## RECONCILIATION

This Appraisal Report has developed an indication of market value for the entire subject property through the Sales Comparison Approach. This approach is considered most relevant to the subject property for both the before and after fair market valuations. Available market data was taken from comparable submarkets, with adjustments made for varying locational and physical characteristics. Good comparable sales permitted a limited number of adjustments, lending weight to this Approach.

## DAMAGES

Damages consider the quality and condition of the real estate prior to the taking and in this case more specifically pertains to the replacement value or cost for a similar type site. The value after the taking, while only reducing the land area by approximately 1.315 acres, substantially reduces the viability of the use of the site as the land area to be taken traverses the central part of the site creating two noncontiguous parcels. The difference between these two valuation scenarios results in damages to the real property value interest.

The attributes of the subject site *prior to the taking* are considered and compared with the limitations that result subsequent to the taking. The attributes include:

- The I-3, General Industrial zoning is the most liberal of the Allentown City's industrial zoning categories.

- The subject location immediately north of the existing American Parkway corridor.

- Location of less than one mile south of U.S. Route 22 with only one traffic signal between the subject property and the east bound highway entrance.

- The topography provides for storage of material without additional construction barriers or infrastructure improvements to contain the storage material from leaving the site.

*Subsequent to the taking,* the following limitations, restrictions or reduction in quality of the real estate are considered:

- Reduction in the land area by 0.982 acre.

- Steep slope easement area (0.365 acre) further reduces land use potential.

- Bisecting of the property and the taking of the central site elevation.

- Division of the property into two significantly smaller parcels which results in the inability to continue the same recycling and storage operation.

- 46 -



### RECONCILIATION– (Continued)

- There are few sites available that would serve as adequate replacements with a comparable level of zoning and that would also permit a similar type operation.

- To acquire a replacement site with similar logistical capabilities, a zoning variance may be necessary for a number of available or comparable sites within proximity to the major highways.

After considering all of the information submitted within this Appraisal Report, the fair market value conclusions for the property, as of August 22, 2011, are:

|  |  |
|---|---|
| MARKET VALUE BEFORE THE TAKING: | $840,000 |
| MARKET VALUE AFTER THE TAKING: | $130,000 |
| DAMAGES | $710,000 |



## EXHIBITS



## QUALIFICATIONS OF CHRISTOPHER J. HALL

### EXPERIENCE

Mr. Hall is President of the Appraisal Division of Binswanger and has been involved in the inspection and analysis of commercial, industrial, and residential real estate since 1986. Valuations and analyses have been prepared for properties located in thirty-five (35) U.S. States, Mexico, Guatemala, Panama, Brazil and Japan.

### EXPERT TESTIMONY
U.S. District Court for the Northern District of Illinois
Colorado State Board of Assessment Appeals, Denver, CO
Connecticut Superior Court, New Britain, CT
Court of Common Pleas, Philadelphia, PA
Federal Bankruptcy Court, New York, NY

Real Estate Assessment Hearing Testimony in the City of Philadelphia; Adams, Berks, Bucks, Carbon, Chester, Delaware, Franklin, Monroe, Montgomery and Westmoreland Counties, Pennsylvania and Frederick County, Virginia

### LICENSE/CERTIFICATION

Real Estate Broker: Commonwealth of Pennsylvania License No. AB-049439-L
Certified General Real Estate Appraiser State Certifications held in:
Pennsylvania License No. GA-000213-L
Georgia License No. 5593
New Jersey License No. RG1416
New York License No. 46000031750
Ohio License No. 2005002961
Virginia License No. 4001 010393
Wisconsin License No. 1692-010

### PROFESSIONAL AFFILIATIONS

Member of the Tristate Commercial & Industrial Association of Realtors
Associate Member - Appraisal Institute

### TECHNICAL TRAINING
Courses completed through the Appraisal Institute include:

| | |
|---|---|
| Basic Valuation | Case Studies in Valuation |
| Real Estate Appraisal Principles | Report Writing and Valuation Analysis |
| Standards of Professional Practice | Capitalization Theory & Techniques - Parts A & B |



## QUALIFICATIONS OF CHRISTOPHER J. HALL - (Continued)

### EDUCATION

Temple University, 1986: B.B.A., Major in Real Estate
Continuing education through the Appraisal Institute, Temple Real Estate Institute,
and various vocational and educational institutions for broker licensure and appraiser
certifications requiring up to twenty-eight (28) hours biannually.

### SCOPE OF APPRAISAL ACTIVITY

### TYPES OF PROPERTIES

| | | |
|---|---|---|
| Industrial Plants & Land | Office Buildings | Shopping Centers & Malls |
| Commercial Buildings & Land | Apartments | Institutional Properties |
| Hotels & Lodging Facilities | Nursing Homes | Residential Subdivisions |

### UNIQUE ASSIGNMENTS

625,000 Square Foot Semiconductor Manufacturing Facility, Irving, TX
9.3 Million Square Feet of Institutional Property on 1,806 Acres in Bronx, Queens
    and Suffolk County, NY
1.2 Million Square Foot Industrial Complex, New Holland, PA
720,000 Square Foot Refrigerated Warehouse, Ocala, FL
600,000 Square Foot Shopping Center, Harahan, LA
Limestone Quarry on 313 Acres, Rockingham County, VA
677,000 Square Foot Multi-Tenant Industrial Complex, Philadelphia, PA
96-Suite Hotel, Key West, FL
Ice Hockey Rinks in Harrisburg, Mechanicsburg, and King of Prussia, PA
420-Acre Subdivision for 450 Residential Units and 1.3 Million Square Feet of
    Office, Retail, Flex, and Hotel Development, Berks County, PA
Private School on 200 acres, Redding, California
Petrochemical Storage Site, Altamira, Mexico
Automotive Parts Manufacturing Facility in Porto Alegre, Brazil
Office Buildings in Rio de Janeiro, São Paulo, and Belém, Brazil
Multi-Property Assignments in Barra da Tijuca, Botafogo, Urca and Angra dos Reis
    Districts, RJ, Brazil
Pharmaceutical Manufacturing Facility and Corporate Office, São Paulo, Brazil
Pharmaceutical Manufacturing Facilities, Guatemala City, Guatemala
900,000 Sq. Ft. Semiconductor Manufacturing/Assembly Facility, Sendai, Japan



## QUALIFICATIONS OF CHRISTOPHER J. HALL - (Continued)

### REAL ESTATE ANALYSES HAVE BEEN PREPARED FOR:

Agere Systems
Bank of America
Bayer
Bell Atlantic/Verizon
BP Lubricants
Brown & Williamson Tobacco
Browning Ferris Industries
Buckeye Technologies
Cargill
Caterpillar
Calgon Carbon
C&J Clark
Citibank
Coastal Mart
Coors Brewing Co.
Dana Corporation
Danaher Corporation
Dresser Industries
Drexel University
Eastman Kodak Company
Enron Corp.
Exide Technologies
ExxonMobil
Fleet Capital Corporation
Federal Mogul Corporation
FMC Corporation
Ford-New Holland, Inc.
GAF Roofing Materials
GE Capital Corporation
General Electric
General Motors Corporation

Grand Metropolitan, Inc.
Handy & Harman
Hanson Industries
Hexcel Corporation
Hitachi
Hoechst Marion Roussel
Jockey International, Inc.
Johnson & Johnson
LWB Refractories
Motorola
McGraw-Hill, Inc.
PECO Energy
Pirelli Tire
Philips Electronics
Republic Engineered Products
Rohm & Haas Company
Shell Oil
SFK
Smiths Industries
Sony Corporation
J. P. Stevens & Company
Special Metals
Swift & Co.
Tasty Baking Co.
Teleflex
Temple University
U.S. Department of State
Unisys
Visteon
Whirlpool Corporation
WinCup

# EXHIBIT "C"

*TRUCK AND TRANSPORTATION SERVICES OPERATING AGREEMENT*

**_HRI, INC._**
*Contractor*

**WITH**

*Adam's Earth Products* Lehigh Valley Properties
Service Provider

*Phone: 610-799-5037*

*FAX:* 610-267-3304

*E-Mail:* _____

*1*

## *TRUCK AND TRANSPORTATION SERVICES OPERATING AGREEMENT*

*This Agreement, made and entered into this ‾‾ n d ‾‾ day of ‾‾ January / June ‾‾, 20 12 , by and*

*between the following:*

*"CONTRACTOR"*

*Name: HRI, INC.*

*Address: 1750 WEST COLLEGE AVENUE*
        *STATE COLLEGE, PA 16801*

*SERVICE PROVIDER*

*Name:*
*‾‾‾‾‾‾ Adam's Earth Products / Lehigh Valley Properties*

*Address:*
    *5828 Park Valley Road*
    *Schnecksville, PA 18078*

*PROJECT OWNER:*        *VARIOUS*

*PROJECT DESCRIPTION:*   *VARIOUS*

*DESCRIPTION OF SERVICE: HAULING TO FROM AND ON VARIOUS HRI, INC. PROJECTS/PLANTS ON AN AS-NEEDED BASIS*

*LIST OF ATTACHMENTS:*   *HRI, INC. MINIMUM INSURANCE REQUIREMENTS*
                        *W-9 FORM*

2

## COMMONWEALTH NONDISCRIMINATION/SEXUAL HARASSMENT FORM

### GENERAL PROVISIONS

A.   Contractor desires to obtain from Service Provider transportation services in the form of dump trucks, tractor-trailers, low-boy units or other motorized vehicles for the purpose of transporting excavated materials, aggregates, hot mix asphalt, equipment, liquid asphalt, precast concrete products and other similar commodities from, on or to Contractor's plants and construction projects, and/or from outside manufacturing or distribution facilities to Contractor's plants or construction projects. Contractor further desires Service Provider to provide driver services on an as-needed and on-call basis for the purpose of operating the motorized transportation vehicles provided by Service Provider. The Service Provider desires to provide such motorized transportation vehicles and to provide such driver services to Contractor in accordance with the following terms and conditions. Now, therefore, the parties, intending to be legally bound hereby, mutually covenant and agree as follows:

1.   PROOF OF OWNER/OPERATOR STATUS - When required by Contract Provisions and prior to start of work an Owner/Operator providing Service must provide proper acceptable documentation to Contractor verifying legitimate Owner/Operator status. The Governmental Agency controlling the Project will determine acceptability of said Documentation. Documentation will include but not be limited to copies of Owner's Driver License, Vehicle Registration and Insurance Certification for Owner's/Operator's vehicle. Owner/Operator must also present the aforementioned documentation to the pertinent governmental representative (i.e., PennDOT Chief Project Inspector) at the project site prior to commencing work. It is understood that Owner is the only person permitted to operate the service vehicle under the terms of this Agreement. Failure to produce acceptable documentation verifying ownership of the service vehicle will make this Agreement immediately null and void with no penalty or damage being attributable to Contractor.

2.   SCOPE OF SERVICE - Services to be provided shall be as set forth on page 2 of this Agreement, and may be supplemented by a separate HRI, Inc. Equipment Rental Agreement, Purchase Order, Service Agreement or any combination thereof, with any such separate document being incorporated in its entirety into and made part of this Agreement.

3.   EQUIPMENT MAINTENANCE - Service Provider agrees to maintain the Equipment in accordance with any Contractor and governmental safety standards. In the event the Equipment is found to be deficient by any government agency or by Contractor, Service Provider agrees to remove the Equipment from service with Contractor until Contractor's or the governmental agency's safety standards are satisfied fully.

4.   PREDETERMINED PREVAILING MINIMUM WAGES - Service Provider will provide complete, timely and accurate Certified Payroll Reports for its operators/employees when services being provided require payment of Predetermined Prevailing Minimum Wages; said Certified Payroll Reports to be provided in strict accordance with the Owner's requirements, in the prescribed format, at the prescribed intervals, and will be submitted to the address and person so designated by the Contractor or Owner.

5.   SAFETY - The Service Provider shall comply with Contractor's basic job safety rules and with all applicable local, state and federal safety regulations, and will perform all services rendered hereunder in a safe and efficient manner.

3

a.  *Contractor's Safety Policy requires the wearing of approved Hard Hats, Safety Glasses with Clear Side Shields (or approved side shields for prescription glasses), Safety Vests and Appropriate Construction Footwear when Owner is out of the truck within the limits of construction.*

b.  *Service Provider will attend Contractor's Weekly On-Job "Tool Box Safety Meetings" when present at the time said Tool Box meetings are conducted.*

c.  *Service Provider's Driver/Operator shall be responsible for the legal, safe and proper loading, securing, covering as required, and unloading of all materials transported under this agreement.*

6.  *INDEPENDENT CONTRACTOR - In making and performing this Agreement, Service Provider acts and will act at all times as an independent contractor, and nothing contained in this Agreement will be construed or implied to create the relationship of partners, principal-agent, employer-employee, or joint venturers between the parties. However, Contractor may instruct Service Provider with regard to the method, manner and means of transporting cargo by operation of the Equipment, but operation of the Equipment will be under the exclusive control of Service Provider in the performance of its obligations under this Agreement.*

7.  *DRIVER QUALIFICATION - Service Provider's Employees or Owner/Operator must possess the proper License(s) required by Federal, State, and Local Agencies to operate the service vehicle, and demonstrate the ability to operate said vehicle in a safe and responsible manner.*

8.  *EXPENSES FOR EQUIPMENT OPERATION - Service Provider will bear all costs and expenses for operation of the Equipment including without limitation all maintenance, fuel, oil, tires, repairs, fuel taxes and all applicable road use taxes, ton-mile taxes, insurance, licenses, base plates, and all highway, bridge and ferry tools unless otherwise expressly set forth in this Agreement. Service Provider agrees to pay all such licenses, taxes and fees as they become due and to reimburse Contractor for any expenses or penalty fees incurred by Contractor in connection with Service Provide's delinquent payment of any necessary licenses, taxes and fees. Although not required to make such payments, in the event Contractor pays such licenses, taxes and fees on behalf of Service Provider, Contractor may charge back against and deduct from any compensation owed to Service Provider by Contractor the costs of same.*

9.  *LOGS AND REPORTS - Service Provider agrees to completely prepare and file with Contractor or any governmental agencies any logs, mileage reports, fuel receipts and other documents necessary to enable Service Provider and Contractor to comply with all laws, rules, regulations and orders with respect to same. Service Provider agrees to indemnify Contractor for any liability or claims against Contractor arising out of the failure of Service Provider to completely and accurately prepare or timely file the foregoing logs, reports or documents.*

10. *SHIPPING DOCUMENTS AND COLLECTIONS - Service Provider will prepare and obtain the appropriate signatures on any shipping documents Contractor or any governmental agency may require from time to time and will return such documents to Contractor or the governmental agency.*

11. *CONTRACT PRICE - Contractor will pay to Service Provider for performance of the services which are the subject matter of this Agreement the Contract Price as stated in the HRI, Inc. Equipment Rental, Purchase Order, Service Order or other agreement incorporated herein and at the frequency so stated therein. If payment is made per delivery trip, for purposes of the Agreement, "trip" shall be defined as the round trip operation of the Equipment for the purpose of transporting aggregates or other cargo as*

4

*instructed by Contractor between Contractor's facility and the Contractor-designated destination.*

12. *DEDUCTIONS FROM CONTRACT PRICE - At the discretion of Contractor, Service Provider will allow and hereby authorizes Contractor to deduct from the Contract Price for the following:*

    a. *Taxes (plus any applicable interest and penalties) including without limitation fuel and road use taxes, ton-mile taxes, excise taxes and ad-valorum taxes assessed against the Equipment.*

    b. *All fines, penalties and costs resulting from Service Provider's violations of any laws, ordinances, rules or regulations with respect to the safety, maintenance or operation of the Equipment, including without limitation violations of overweight or oversize laws, ordinances, rules and regulations.*

    c. *Property and cargo loss and damage claims if such loss or damage is caused by the willful act or negligence of Service Provider.*

    d. *Unauthorized charges or expenses incurred by Service Provider in Contractor's name.*

    e. *The cost of unexpired portions of all permits, licenses and plates furnished to Service Provider by Contractor at Contractor's expense or procured by Service Provider at Contractor's authorization, direction and expense, if either party should terminate this Agreement in accordance with Section 20 of the Agreement.*

    f. *Any charges or expenses authorized by Service Provider to be paid by Contractor on Owner/Operator's behalf.*

13. *METHOD OF PAYMENT - Service Provider will be paid for services rendered in a manner and frequency mutually agreed to and set forth in this Agreement or attachment hereto, less any compensation deductions in accordance with Article 12 of this Agreement.*

14. *INSURANCE REQUIREMENTS - Service Provider will during the term of this Agreement assume sole responsibility to provide and pay for all insurances set forth in the ʌHRI, INC. MINIMUM INSURANCE REQUIREMENTS® which are attached hereto and made part of this Agreement. Coverages shall be kept in force for such period of time as required by HRI, Inc. or the project owner. Service Provider will provide evidence of such insurances to Contractor prior to performing any service. Service Provider herewith agrees that under the terms of this Agreement he/she is an independent contractor and not an employee of HRI, Inc., and as such is solely responsible for withholding and payment of all Social Security Tax, Income Withholding Taxes, and all other like taxes. A bonafide Owner/Operator Service Provider who elects not to provide Worker's Compensation Insurance for his/her self herewith waives any and all claims whatsoever to coverage under HRI, Inc. insurances.*

15. *LIABILITY FOR EQUIPMENT - Contractor will not be liable to Service Provider for any depreciation or damage that may occur to the Equipment unless such damage is caused by the willful act or gross negligence of Contractor, its agents or employees.*

16. *INDEMNIFICATION - Service Provider will indemnify, defend and hold harmless Contractor, its Parent, Subsidiaries, Partners, Officers, Directors, Shareholders, Employees, Agents, Affiliates, Licensees and Representatives, Contractor, and the Owner(s) from and against:*

5

a.  All claims brought against Contractor and all liabilities incurred by Contractor for or on the account of bodily injury or property damage in any manner caused by, incidental to or growing out of any act of omission of Service Provider arising out of the ownership, maintenance, use or operation of the Equipment, the conduct of Service Provider's business or Service Provider's delivery of services under this Agreement.

b.  Any loss of or damage to cargo tendered to Service Provider for shipment or handling in accordance with this Agreement while such cargo is in the possession, custody or control of Service Provider.

c.  Any and all claims brought against Contractor and liabilities incurred by Contractor arising out of Service Provider's relationship with Contractor, whether under industrial accident laws, workers' compensation laws, or any other federal, state or local laws, rules or regulations.

d.  Any and all claims brought against Contractor or liabilities incurred by Contractor for or on account of Service Provider's failure to comply with any laws, rules or regulations applicable to Service Provider's business.

17.  NOTICE OF ACCIDENTS, CLAIMS OR SUITS - Service Provider will notify Contractor immediately of any incident resulting in property damage and any incident or accident involving any pedestrian or any occupant of any type of vehicle, including the Equipment, whether or not the incident or accident appears to have resulted in personal injury. Service Provider will immediately forward to Contractor copies of every demand, notice, summons or other process received by Service Provider that involved the claim, suit or other legal proceeding arising from Service Provider's ownership, rental, lease, maintenance, or operation of the Equipment or performance of services pursuant to this Agreement.

18.  SERVICE PROVIDER'S COOPERATION - Service Provider agrees to cooperate fully with Contractor in the defense or prosecution of any lawsuits arising from Service Provider's performance of its obligations under this Agreement, including without limitation attendance at hearings and trials and assistance in securing evidence or obtaining the attendance of witnesses.

19.  TERM - This Agreement shall continue in full force and effect until terminated as provided in Section 20 herein.

20.  TERMINATION - Either party may terminate this Agreement without cause upon thirty (30) days prior written notice to the other party made by registered or certified mail, return receipt requested. Contractor may terminate this Agreement, effective immediately upon delivery of notice of such termination to Service Provider, in the event Service Provider breaches any provision of this Agreement, becomes insolvent, makes an assignment for the benefit of creditors, or if there are instituted by or against Service Provider proceedings in bankruptcy or for reorganization, receivership or dissolution.

21.  INTEGRATION - This Agreement and any referenced attachments incorporated hereto constitute the entire Agreement and understanding between the parties and shall supersede any prior negotiations, representations, agreements or communications between the parties, whether oral or written. This Agreement shall not be modified or amended in any way unless in writing signed by both parties.

6

22. *MISCELLANEOUS -*

a.     *This Agreement shall be binding upon and inure to the benefit of the parties of this Agreement and their respective heirs, successors and assigns, but shall not be assigned or transferred by Service Provider without the prior consent of HRI, Inc., which consent may be withheld by HRI, Inc. at its sole discretion. If any Section or part thereof of this Agreement is declared unlawful or unenforceable, the remainder of this Agreement shall remain in full force and effect. Failure of either party strictly to enforce any provision of this Agreement shall not be construed as a waiver of that party's rights under such provision or as excusing the other party from future performance. Headings appearing in this Agreement are for convenience only and in no way limit, modify or otherwise affect the terms and provisions of this Agreement. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to its conflicts of laws provisions.*

b.     *If a dispute relating to or arising out of this Agreement results in litigation, the successful party in the litigation which is awarded damages or other relief pursuant to an Order of Court shall be entitled to recover reasonable attorney fees in addition to other costs and interest.*

c.     *No amendment, change or modification of any of the terms, provisions or conditions of this Agreement shall be effective unless made in writing and signed on behalf of the parties hereto by their duly authorized representative.*

d..    *This Agreement shall be interpreted and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to its conflicts of laws provisions. The parties hereto waive any objection to personal jurisdiction in the state or Federal courts sitting in such State; and agree that the mailing to the last known address of the respective parties of any process by Certified mail, return receipt requested, shall constitute lawful and valid service of process.*

e.     *This Agreement may be executed in one or more components, each of which shall be deemed to be an original but all of which together shall constitute but one and the same document.*

f.     *Any failure by HRI, Inc. at any time, or from time to time, to enforce or require the strict keeping and performance by Service Provider of any provisions of the Agreement shall not constitute a waiver by HRI, Inc. of such provisions, and shall not impair or affect such provisions in any way, or the right of HRI, Inc. at any time to avail itself of any remedy it may have. The waiver, illegality, invalidity and/or non-enforceability of any provision of the Agreement shall not affect the validity of the Agreement as a whole or the validity of any other provisions herein.*

*NOTE: THIS AGREEMENT WILL REMAIN IN EFFECT UNTIL CANCELLED IN WRITING BY EITHER HRI, INC. OR THE SERVICE PROVIDER*

*Corporate Seal]*
*Contractor*

*HRI, INC.*

..............................................................................
*Contractor*

By.. *Scott A. Strouse* ...7/17/12..........
    Scott A. Strouse        *DATE*
    Vice President

*Attest:*

..............................................................................

*Debra A. Keirn*
*Assistant Secretary- Contractor*

*Adam's Earth Services* Products — Lehigh Valley Properties Inc.
    *Service Provider*

By.. .................................................. *1*
    *[Signature]*

President
..............................................................................*2*
    *[Title]*    July 16, 2012
               *[Date]*

*Witnesses:*

..............................................................................*3*

..............................................................................*4*

*If the Service Provider is an Individual: sign here 1 and so indicate here 2.*
*Unless acknowledged below, execution by Service Provider must be witnessed here 3,4.*

*STATE OF PA*
*COUNTY OF Lehigh*

*[Acknowledgement by Service Provider)*
           )
           )
           *ss*

*On this 16 day of July, 2012 before me personally came Lauri E Atiye to me known to be the person described*
*in, and who executed the foregoing instrument and who acknowledged that he executed the same.*

*Dolores M. Breitfeld*    *My Commission Expires*

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Dolores M. Breitfeld, Notary Public
Whitehall Twp., Lehigh County
My Commission Expires April 27, 2016
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

*8*

# APPENDIX C
## DESIGNATED SPECIAL PROVISION 10 (DSP10)

## NONDISCRIMINATION/SEXUAL HARASSMENT CLAUSE

During the term of the Contract, the Contractor agrees as follows:

(a) In the hiring of any employees for the manufacture of supplies, performance of work, or any other activity required under the Contract or any subcontract, the Contractor, subcontractor or any person acting on behalf of the Contractor or subcontractor shall not by reason of gender, race, creed, or color discriminate against any citizen of this State who is qualified and available to perform the work to which the employment relates.

(b) Neither the Contractor nor any subcontractor nor any person on their behalf shall in any manner discriminate against or intimidate any employee involved in the manufacture of supplies, the performance of work or any other activity required under the Contract on account of gender, race, creed, or color.

(c) The Contractor and any subcontractors shall establish and maintain a written sexual harassment policy and shall inform their employees of the policy. The policy must contain a notice that sexual harassment will not be tolerated and employees who practice it will be disciplined.

(d) The Contractor shall not discriminate by reason of gender, race, creed, or color against any subcontractor or supplier who is qualified to perform the work to which the contract relates.

(e) The Contractor and each subcontractor shall furnish all necessary employment documents and records to and permit access to its books, records, and accounts by the contracting officer and the Department of General Services', Bureau of Contract Administration and Business Development (DGS, BCABD) for purposes of investigation to ascertain compliance with the provisions of this Nondiscrimination/Sexual Harassment Clause. If the Contractor or any subcontractor does not possess documents or records reflecting the necessary information requested, it shall furnish such information on reporting forms supplied by the contracting officer or the BCABD.

(f) The Contractor shall include the provisions of this Nondiscrimination/Sexual Harassment Clause in every subcontract so that such provisions will be binding upon each subcontractor.

(g) The State may cancel or terminate the Contract, and all money due or to become due under the Contract may be forfeited for a violation of the terms and conditions of this Nondiscrimination/Sexual Harassment Clause. In addition, the agency may proceed with debarment or suspension and may place the Contractor in the Contractor Responsibility File.

Adam's Earth Products   Lehigh Valley   July 16, 2017
Service Provider            Properties      Date

BY

# EXHIBIT "D"























# EXHIBIT "E"

## LEHIGH VALLEY PROPERTIES
### 5828 Park Valley Road Schnecksville PA 18078
### 610-799-5037

**Aldredge Electric**
**844 E. Rockland Road, Libertyville IL 60048**
**Fax: 847-680-5298  Attn: Peter Kenny/Tom Tucker**
**Dual Cable P.O. 190970D**

**Urgent Message**
**Effective Immediately**

Again it's with regret I write your company. LVP cannot accept the Dual Cable Project in Allentown at this time. LVP understands the seriousness of this major project with PPL and needs to stress the danger and seriousness of LVP's site being out of space. LVP is unable to handle the project as LVP wrote you in April. I personally gave you the names of two companies which I believe could help you. They are far away. LVP could really use the business and appreciates the past 3 years, there is nothing we can do until the city's eminent domain of LVP is resolved. Please inform Ground Tech of the same. They must find a new place.

Regrets

Lehigh Valley Properties

cc: Rich - Ground Tech